**G. PATRICK CIVILLE**
**JOYCE C.H. TANG**
**CIVILLE & TANG, PLLC**
330 HERNAN CORTEZ AVENUE, SUITE 200
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 472-8868/69
FACSIMILE: (671) 477-2511
EMAIL: pciville@civilletang.com

*Attorneys for Plaintiff/Relator*

## IN THE UNITED STATES DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* and RAVINDRA GOGINENI, <br><br> Plaintiffs/Relator, <br><br> vs. <br><br> FARGO PACIFIC INC., EDGAR L. MCCONNELL, and JAY S.H. PARK, <br><br> Defendants. | CIVIL CASE NO. 17-00096 <br><br><br> **FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT, 31 U.S.C. §3729,** *et seq.* <br><br> **JURY TRIAL DEMANDED** |

Plaintiff/Relator, RAVINDRA GOGINENI ("Relator"), brings this *qui tam* action in the name of the United States Government, against Defendants FARGO PACIFIC INC. ("Fargo"), EDGAR L. MCCONNELL ("McConnell") and JAY S.H. PARK ("Park"), and allege as follows:

### I.     GOVERNMENT CONTRACTS AT ISSUE

1.     The false claims alleged in this First Amended Complaint relate to two (2) United States Government contracts. They are **Contract No. N40192-06-D-2540**, IDIQ Contract for Roofing Construction Contract – Miscellaneous Roofing Repairs at Various Locations, Guam ("2006 IDIQ Contract"), and **Contract No. N40192-09-D-2710**, the IDIQ Contract for Roofing Systems Installation and Repair, Various Locations, Guam ("2009 IDIQ

Contract"). The two (2) IDIQ Contracts shall be collectively referred to as the "IDIQ Contracts".

2. The total contract price for each of the IDIQ Contracts are as follows:

| 2006 IDIQ (awarded in 2006) | Fargo Pacific Contract | $9.68 Million |
| 2009 IDIQ (awarded in 2009) | Fargo Pacific Contract | $20.4 Million |
| | TOTAL | $30.08 Million |

## II. **PARTIES**

3. Plaintiff/Relator, Ravindra Gogineni, is an individual and is a resident of Guam.

4. Plaintiff, the United States of America, acting herein through the United States Navy ("Navy"), a Military Department within the Department of Defense which is a federal executive department of the United States, awarded and administered the Contract.

5. Defendant, Fargo Pacific Inc., is and was at all times relevant hereto, a corporation licensed to business on Guam.

6. Defendant Edgar L. McConnell is and was at all times relevant hereto, a resident of California.

7. Defendant, Jay S.H. Park, is and was at all times relevant hereto, a resident of Guam.

//
//

2

### III. JURISDICTION, VENUE AND OTHER STATUTORY REQUIREMENTS

8.      The Relator brings this civil action for violations of 31 U.S.C. § 3729 for Relator and for the United States of America, pursuant to the provisions of 31 U.S.C. § 3730(b)(1).

9.      This action arises under the laws of the United States, specifically, the False Claims Act, 31 U.S.C. §§ 3729 et seq., and this Court therefore has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

10.     The IDIQ Contracts were to be performed and executed in Guam and the acts described herein which are prescribed by the False Claims Act occurred in Guam, and therefore, venue in this district is proper under 31 U.S.C. § 3732(a).  Venue in this district is also appropriate under 28 U.S.C. § 1391(b)(2) and (c) in that a substantial part of the events giving rise to the claims occurred in Guam.

11.     As required by 31 U.S.C. § 3730(b)(2), the Relator served the United States Attorney General and the United States Attorney for the District of Guam with copies of the complaint along with a written disclosure of all material evidence and information related to the complaint.  The disclosure statement supports the allegations herein of false claims against the United States by the Defendants.   Because the statement includes attorney-client communications and work product of the Relator's attorneys, and was submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in the litigation, the Relator understands and asserts this disclosure to be confidential.

12.     On February 12, 2019, the United States filed its Notice of Election to Decline Intervention (ECF 17).

13. The court thereafter issued an order unsealing the complaint and ordering *inter alia* that the complaint be served upon the defendants. Order (ECF 18) (3/5/2019).

## IV.    RELATOR'S STANDING

14. The allegations relating to Defendants Fargo, McConnell and Park's scheme, false and deceptive statements and false claims, as set forth in this First Amended Complaint, have not been publicly disclosed and were not known to the United States until Relator voluntarily came forward and presented the information to the United States.

15. The Relator is the original source, within the meaning of 31 U.S.C. §3730(e)(4), of the information set forth in this First Amended Complaint pertaining to false claims.

## V.    GENERAL ALLEGATIONS

16. Pursuant to Section 8(a) of the Small Business Act, the Small Business Association's ("SBA") 8(a) Business Development Program promotes the development of small businesses controlled by socially and economically disadvantaged individuals. To achieve this goal, the SBA offers 8(a) certification to small, minority-owned businesses, and certain federal contracts are set aside for businesses which are 8(a) certified. Among the requirements for 8(a) eligibility is that a business be majority-owned (51% or more) by socially and economically disadvantaged individual(s). Under 13 CFR § 124.1, businesses can be 8(a) certified for up to nine (9) years, at which point they graduate out of the program.

17. Fargo is a general contractor which has been incorporated in the Territory of Guam since September 24, 1975. Fargo was founded by Jin Sik Park, and his son Jay Park assumed the position of President and General Manager of Fargo on January 1, 2002.

4

18.     Fargo was certified under the SBA 8(a) program on September 10, 2002, and graduated from the program on September 10, 2011.  Fargo's SBA 8(a) Case Number was 108557l, its HUB Zone number was 20593, and its SBA Customer ID was PO215249.

19.     Jay Park was and is the president of Fargo owning over 51% of the interest in Fargo, an Asian American individual falling within the "presumed groups" of socially disadvantaged individuals.  SBA rules require Fargo to be controlled by the disadvantaged majority owner – Jay Park.

20.     Between September 9, 2002 and September 10, 2011, Fargo was certified by the Small Business Administration as a Small Business under the 8(a) Business Development Program and as an Asian American owned business.

21.     13 CFR §124.1 limits certification of 8(a) companies to 9 years. Fargo's 8(a) designation expired on September 10, 2011.

22.     SBA regulations require that the disadvantaged individual, here, Jay Park, the president of Fargo, own a controlling interest in Fargo of not less than 51% of the company, and that he comply with the requirements of Title 13 CFR §124.106 regarding the control requirements of the disadvantaged individuals in a participant of the SBA Business Development program.

23.     The SBA notified Fargo on April 28, 2009 that Fargo was no longer owned by economically disadvantaged individuals, and therefore, was eligible for graduation from the 8(a) Business Development Program.

24.     On December 17, 2009, the SBA. through its San Francisco Division of Program Certification & Eligibility, issued a letter notifying Fargo of SBA's intent to

5

graduate Fargo from the 8(a) Business Development Program prior to the expiration of its program term after determining that Fargo was no longer economically disadvantaged.

25. Subsequently, the SBA issued a letter on June 21, 2010 notifying Fargo that its early graduation date would be effective forty-five (45) days from the date it received the June 21st notice.

26. Fargo appealed the June 21, 2010 decision of early graduation to the Office of Hearings and Appeals on August 4, 2010.

27. Fargo eventually graduated from the 8(a) Business Development Program on September 10, 2011.

28. At the time Fargo was a certified 8(a) Business Development Program, Fargo entered into secret illegal agreements with McConnell, a person who is not a member of a minority or of Asian descent, to circumvent the control requirements under Title 13 CFR §124.106.

29. Fargo violated SBA regulations and other federal law when it entered into these secret illegal agreements with McConnell.

### *Fargo Consulting Agreement With McConnell*

#### *2007 Consulting Agreement*

30. On November 16, 2007, Fargo and McConnell entered into a secret illegal *Consulting Agreement* relating to the 2006 IDIQ Contract ("2007 Consulting Agreement"). A true and correct copy of the 2007 Consulting Agreement is marked and attached hereto as **Exhibit A.**

31. The 2007 Consulting Agreement would form the basis for their agreement regarding future Fargo IDIQ Contracts.

6

32.     Under the terms of the 2007 Consulting Agreement, McConnell agreed to assist Fargo in performing the roofing contract task order work.  McConnell and Fargo agreed that for all roofing work, because of McConnell's expertise and ability to source roofing materials competitively, he would be entitled to 50% of the "Gross Profit."  McConnell had the responsibility of maintaining job costs and profit spreadsheets, and Fargo was responsible for maintaining accounting reports and records, and distributing McConnell's 50% of the "Gross Profit" after it received payment from the Government.

33.     Paragraph 17 of the 2007 Consulting Agreement further states that "Fargo Personnel will forward copies of all invoices and issued checks of direct cost items to Ed so that they may be approved [by McConnell] and included in the Gross Profit Spreadsheet.  It is important for all invoices to be forwarded in a timely manner to allow for payment after approval by Ed [McConnell]."

34.     The 2007 Consulting Agreement defined "Gross Profit" as the "difference between the Task Order (Contract) amount and the direct costs (installed materials and the labor to install) of the Task Order."  In other words, each task order amount, after deducting the direct costs for materials, labor and Gross Receipt Tax on that task order, will be the Gross Profit.  It is this "Gross Profit" that is split equally between Fargo and McConnell, and it was subject to McConnell's sole right to approve or disapprove an invoice or cost item.

35.     The 2007 Consulting Agreement unequivocally states that "Gross Profit" will be "evenly divided (50/50) between Fargo and Ed McConnell (Ed) upon final payment by the customer, and after all cost of the specific Task Order have been accounted for, Partial distributions of the anticipated Gross Profit proceeds may be made to Ed if 100% customer payment is delayed or if approved by both parties."

36.     Paragraph 20 of the 2007 Consulting Agreement states that the "terms of this agreement will be kept confidential by both parties."  The 2007 Consulting Agreement was a secret agreement that was not disclosed to the SBA or the United States.

37.     The 2007 Consulting Agreement was a secret agreement that gave McConnell control, interest and 50% share of the Gross Profits from all task orders issued under the 2006 IDIQ Contract.   The 2007 Consulting Agreement states that "Ed [McConnell] and Jay [Park] will approve all costs added to the direct costs, and both individuals will approve the spreadsheet before payment to Ed [McConnell of his 50% of the Gross Profit]."

38.     McConnell was an equal partner and/or was in a *de facto* joint venture with Fargo on the 2007 Consulting Agreement with control and approval powers in violation of 3 CFR §124.106 regarding the control requirements of the disadvantaged individuals in a participant of the SBA Business Development program.

### *First Amendment to the 2007 Consulting Agreement*

39.     On September 3, 2009, McConnell and Fargo entered into the *First Amendment to Consulting Agreement* which amended the 2007 Consulting Agreement ("First Amendment Agreement").  A true and correct copy of the First Amendment Agreement is marked and attached hereto as **Exhibit B**.  The First Amendment Agreement incorporated the terms of the 2007 Consulting Agreement.

40.     Because of a settlement agreement reached between McConnell, Fargo and Western Roofing, Inc. (a roofing contractor based in California and the then employer of McConnell),  Western Roofing, Inc. ("WRI") released Fargo and McConnell in exchange for a significant amount of money paid to WRI.  Fargo and McConnell agreed that the effective date of the settlement agreement with WRI was the effective date of this First Amendment Agreement.

8

41.     On information and belief, the settlement payment to WRI was $2,028,000 (the "WRI Settlement Payment").

42.     The WRI Settlement Payment was supposed to be paid by McConnell and Fargo on an equal basis.   For reasons unknown to Relator, Fargo advanced or loaned McConnell's one-half of the WRI Settlement Payment.

43.     Under the terms of the First Amendment Agreement, McConnell and Fargo agreed that McConnell's 50% share of the Gross Profit (capped at $2,028,000) from the Task Orders for various Government contracts identified in *Exhibit B* to the First Amendment Agreement would be paid to Fargo as repayment of the monies Fargo advanced or loaned to McConnell for the WRI Settlement Payment.

44.     *Exhibit B* to the First Amendment Agreement covered Fargo's work performed under the 2009 IDIQ Contract, and other military contracts, including: Contract No. N40192-09-Q-2674 (Bid 557A), Contract No. N0192-09-Q-2675 (Bid 37/39), Contract No. N4092-09-R-1326-001 (Bid 1000), LA Painting Task Orders for Buildings 519, 537, 3059, 4001),  Navy Hospital Roofing work Task Order, and Navy Bachelor Quarters Breezeway Roofing work Task Order.

45.     The First Amendment Agreement was a secret illegal agreement that was not disclosed to the SBA or the United States and was made in violation of SBA regulations and federal law.

46.     The First Amendment Agreement was a secret illegal agreement which incorporated the 2007 Consulting Agreement terms, including Paragraph 17, and which gave McConnell control, interest and 50% share of the Gross Profits from all task orders identified in *Exhibit B*, and future task order work issued under the 2006 IDIQ Contract.   McConnell continued to be an equal partner and/or in a *de facto* joint venture with Fargo on the 2007

9

Consulting Agreement, as amended, and for the work identified in *Exhibit B*, in violation of 3 CFR §124.106 regarding the control requirements of the disadvantaged individuals in a participant of the SBA Business Development program.

*Second Amendment to the 2007 Consulting Agreement*

47.     On September 11, 2009, McConnell and Fargo entered into the *Second Amendment to Consulting Agreement* which amended the 2007 Consulting Agreement ("Second Amendment Agreement"). A true and correct copy of the Second Amendment Agreement is marked and attached hereto as **Exhibit C**. The Second Amendment Agreement incorporated the terms of the 2007 Consulting Agreement.

48.     The stated purpose of the Second Amendment Agreement was to include Fargo and McConnell's 50-50 Gross Profit sharing agreement on all task orders issued under the 2009 IDIQ Contract.

49.     By this time, McConnell had paid the advance or loan from Fargo to cover his 50% portion of the WRI Settlement Payment, thus, his 50% of the Gross Profits would be paid directly to him from the task orders issued under the 2009 IDIQ Contract.

50.     The Second Amendment Agreement was a secret illegal agreement that was not disclosed to the SBA or the United States and was made in violation of SBA regulations and federal law.

51.     The Second Amendment Agreement was a secret illegal agreement which incorporated the 2007 Consulting Agreement terms, including Paragraph 17 and the First Amendment, and which gave McConnell control, interest and 50% share of the Gross Profits from all task orders issued under the 2009 IDIQ Contract. McConnell continued to be an equal partner and/or in a *de facto* joint venture with Fargo on the 2007 Consulting Agreement,

10

as amended, in violation of 3 CFR §124.106 regarding the control requirements of the disadvantaged individuals in a participant of the SBA Business Development program.

### *Third Amendment to the 2007 Consulting Agreement*

52.     On October 1, 2011, McConnell and Fargo entered into the *Third Amendment to Consulting Agreement* which amended the 2007 Consulting Agreement ("Third Amendment Agreement").  A true and correct copy of the Third Amendment Agreement is marked and attached hereto as **Exhibit D**.   The Third Amendment Agreement incorporated the terms of the 2007 Consulting Agreement.

53.     The Third Amendment Agreement addressed field bonus payments and disbursement to McConnell and Fargo of warranty reserves on the one year anniversary of the final projects manufacturers' warranty date.

54.     The Third Amendment Agreement was a secret illegal agreement that was not disclosed to the SBA or the United States and was made in violation of SBA regulations and federal law.

55.     The Third Amendment Agreement was a secret agreement which incorporated the 2007 Consulting Agreement terms, including Paragraph 17 and earlier amendments, and which gave McConnell control, interest and 50% share of the Gross Profits from all task orders issued under the 2009 IDIQ Contract.  McConnell continued to be an equal partner and/or in a *de facto* joint venture with Fargo on the 2007 Consulting Agreement, as amended, in violation of 3 CFR §124.106 regarding the control requirements of the disadvantaged individuals in a participant of the SBA Business Development program.

### *Fourth Amendment to the 2007 Consulting Agreement*

56.     June 12, 2013, McConnell and Fargo entered into the *Fourth Amendment to Consulting Agreement* which amended the 2007 Consulting Agreement ("Fourth Amendment

11

Agreement"). A true and correct copy of the Fourth Amendment Agreement is marked and attached hereto as **Exhibit E**. The Fourth Amendment Agreement incorporated the terms of the 2007 Consulting Agreement.

57. The stated purpose of the Fourth Amendment Agreement was to include Fargo and McConnell's 50-50 Gross Profit sharing agreement on all task orders issued under Infratech's 2013 IDIQ Contract (Contract No. N40192-13-D-2901) ("2013 IDIQ Contract")

58. The Fourth Amendment Agreement was a secret illegal agreement that was not disclosed to the SBA or the United States and was made in violation of SBA regulations and federal law.

59. The Fourth Amendment Agreement was a secret illegal agreement which incorporated the 2007 Consulting Agreement terms, including Paragraph 17 and earlier amendments, and which gave McConnell control, interest and 50% share of the Gross Profits from all task orders issued under the 2013 IDIQ Contract. McConnell continued to be an equal partner and/or in a *de facto* joint venture with Fargo on the 2007 Consulting Agreement, as amended, in violation of 3 CFR §124.106 regarding the control requirements of disadvantaged individuals in a participant of the SBA BD program.

### *Fargo's and McConnell's Illegal Secret Joint Venture Teaming Agreement*

60. The Federal Acquisition Regulation ("FAR") recognizes two types of teaming arrangements that may be used by 8(a) concerns competing for federal contract awards, like the 2006 IDIQ Contract and 2009 IDIQ Contract: (1) joint venture teaming agreements; and (2) prime subcontractor teaming agreement. *See* FAR 9.601.1.

61. McConnell and Fargo intentionally deceived the United States into awarding the 2006 IDIQ Contract and 2009 IDIQ Contract to their undisclosed joint venture between

12

Defendants Fargo/Park and McConnell, which was deliberately withheld from the United States.

62.     The secret 2007 Consulting Agreement between McConnell and Fargo conclusively establishes that they had formed a joint venture partnership. The 2007 Consulting Agreement provided for shared control and shared profits and losses. Park and McConnell confirmed their 50/50 sharing of profit and losses in an "Affirmation of Profit/Loss Sharing Agreement Under Penalty of Perjury dated October 27, 2015, wherein they stated under penalty of perjury that:

> "…Fargo Pacific, Inc. and Ed L McConnell have by mutual agreement since 2009 shared equally profits and/or losses realized on all construction projects on which they were jointly engaged. These projects include 46 Task Orders in a 2009 roofing IDIQ contract for the US Navy…."

*See* **Exhibit F** - Affirmation of Profit/Loss Sharing Agreement Under Penalty of Perjury (dated October 27, 2015).

63.     McConnell was a joint venture equal partner on the 2006 IDIQ Contract and 2009 IDIQ Contract. Paragraph 17 of the 2007 Consulting Agreement states that "Fargo Personnel will forward copies of all invoices and issued checks of direct cost items to Ed [McConnell] so that they may be approved [by McConnell] and included in the Gross Profit Spreadsheet. It is important for all invoices to be forwarded in a timely manner to allow for payment after approval by Ed [McConnell]."

64.     The 2007 Consulting Agreement defined "Gross Profit" as the "difference between the Task Order (Contract) amount and the direct costs (installed materials and the labor to install) of the Task Order."

65.     Each task order amount, after deducting the direct costs for materials, labor and Gross Receipt Tax on that task order, constituted the joint venture's Gross Profit. It was

13

this "Gross Profit" that was split equally between Fargo and McConnell. McConnell had the sole right to approve or disapprove invoices and cost items.

66. Removing any doubt as to the nature of the relationship between Fargo and McConnell, the 2007 Consulting Agreement unequivocally stated that "Gross Profit" will be "evenly divided (50/50) between Fargo and Ed McConnell (Ed) upon final payment by the customer, and after all cost of the specific Task Order have been accounted for, Partial distributions of the anticipated Gross Profit proceeds may be made to Ed if 100% customer payment is delayed or if approved by both parties."

67. This undisclosed joint venture was not a recognized teaming agreement under FAR § 9.601 or 13 CFR § 124.513.

68. The undisclosed joint venture violated SBA regulations and rendered Fargo ineligible under the relevant 8(a) regulations from being awarded either IDIQ contract.

### The Arbitrator's Findings Of Deceit, Fraud and Subterfuge Regarding Fargo, McConnell and Park

69. In the Arbitration between Infratech International and Fargo, which is where the existence of the undisclosed joint venture came to light, the Arbitrator's Award made findings regarding Fargo's and McConnell's deception.

70. The Arbitration was divided into two phases: (1) the liability phase, and (2) the damages phase. Phase 1 was decided on July 16, 2015, with the arbitrator finding that a "contract existed between the parties and was breached by [Infratech]." Although the Arbitrator found the agreement was an enforceable contract, he did not hold that under Section 4 of the 2007 Consulting Agreement that Fargo was entitled to 100% of the work on all task orders issued under the 2013 IDIQ Contract.

14

71.     Hearing on Phase 2 took place on September 26 to 29, 2016, on Guam.  During the arbitration, McConnell and Park admitted that they engaged in a pattern of deception against Infratech, WRI (McConnell's prior employer), and the Navy:

a.      Park testified under oath that he expected the Navy to review Infratech's bid proposal, including the Management Plan and Teaming Agreement, and rely on its truthfulness. However, Fargo maintained that it did not have to follow the Management Plan.

b.      Park testified under oath that he hid his profit-sharing agreement with McConnell from the Navy, because he knew that if the Navy found out, he would not get the 8(a) set-aside contracts.

c.      Park testified under oath that he intended to embed his own workers on Infratech's team in order to deceive the Navy.

d.      Fargo and its attorney maintained that its 50-50 profit sharing partnership with McConnell was a joint partnership.

e.      McConnell and Park admitted that they entered into a secret 2007 Consulting Agreement, amended five (5) times, to share the Gross Profits from the 2006 IDIQ Contract and the 2009 IDIQ Contract, which were 8(a) SBA set aside contracts, awarded to Fargo.

f.      McConnell and Park were ordered by the arbitrator to produce copies of the 2007 Consulting Agreement and the five (5) amendments after it was discovered during the hearing that the secret agreements to share profits 50-50 existed.

15

72.    In the Arbitration proceedings, one of Fargo's experts, Ronald A. Maus, confirmed the existence of joint venture relationship between Fargo and McConnell and tried to justify the fact that it was kept secret by opining:

> "This opinion is based upon my review of the identified reports filed by each of Messrs. Farrell and le Roux … ; my review of the financial statements of Fargo for the years ended 2008 through 2013; my discussion with Jay Park of Fargo; my separate discussion with Ed McConnell; and my accumulated education, experience, knowledge, training with respect to the subject matter at hand.
>
> **<u>There is an apparent presumption that due to the fact that Fargo and McConnell operated on the "2009 contract" in some fashion as a de facto joint venture,</u>** that there should be some type of a direct tracking of McConnell's existence as such within the financial statements of Fargo. In both my professional and personal experience, the manner in which Fargo has handled its relationship with McConnell is consistent with other practice … [relating to joint venture participation by construction companies], including my own … [relating to joint venture participation in ownership of thoroughbred horses]."

*See* **Exhibit G** - Fargo Expert Report Prepared by Ronald A. Maus, at 14 (dated September 9, 2016) (emphasis added).

73.    The Arbitrator issued a Final Award for Phase 2 on March 13, 2017.  A true and correct copy of the Phase 2 Final Award is marked and attached hereto as **Exhibit H.**  In the Phase 2 Final Award, the Arbitrator made numerous findings against Fargo regarding Fargo's duplicity and efforts to subvert the truth – which form the basis of claims for violation of the SBA regulations on the 2013 IDIQ Contract and the 2007 Consulting Agreement and its amendments:

a.    "Neither Jay Park nor Ed McConnell were credible witnesses.  In essence, what they attempted to do was lie their way out of a lie.  Their deliberate actions to hide and cover-up significant truth started in Phase

16

One where Fargo's star expert witness, Ed McConnell, failed to reveal that he had a financial stake in the outcome of the case based on a 'Consulting Agreement' he entered into with Fargo on November 28, 2007 giving him 50% of the profit in [the 2009 IDIQ] roofing contract Fargo had with the Navy."

b.  Fargo and McConnell's fraudulent scheme began in Phase 1 and continued into Phase 2 or the arbitration. McConnell and Fargo argued to the Arbitrator that their relationship was that of a joint venture.

c.  Instead, McConnell and Fargo entered into 2007 Consulting Agreement, which was a secret agreement, and that in 2006-2007, while McConnell was the CEO and president of WRI, he "breached his fiduciary to … [WRI], and entered into a secret side deal with Fargo to get … [the 2009 IDIQ] Navy contract to the detriment of [WRI]." This information and the 2007 Consulting Agreement and amendments were discovered by Infratech and the Arbitrator as a result of the "close scrutiny by Infratech's counsel of an email dated August 14, 2013 from McConnell to Park (Exhibit 21) regarding "Fw: 5th Amendment to the Consulting Agreement" which resulted in the Arbitrator ordering Fargo and McConnell to produce these documents during the hearing.

d.  The Arbitrator referred to a report by one of Fargo's experts, Curt Quick (3/7/16 Hainline Report), finding that when Fargo was forced to "own up to and produce the 2007 Consulting Agreement and five amendments thereto. The reason for … [Fargo's] subterfuge becomes

17

obvious when viewing the damage calculations of [Fargo's] damage expert, Curt Quick. Mr. Quick's factor of 38% when calculating damages was based on the assumption that Mr. McConnell's involvement in this project was as a partner with Fargo for 50% of any profits or losses, and thus not to be considered a 'cost.'" Mr. Quick states in his 3/7/16 report regarding Fargo's historical Gross Profit that Fargo's gross profit [was] based upon the historical return on the IDIQ 2009 contract of 38%... Fargo and McConnell realized a 38% Gross Profit on the 2009 IDIQ project…." See **Exhibit I** - Hainline Report, at 2 (dated March 7, 2016). If the secret 50-50 profit sharing agreement came to light, and that "McConnell's involvement in the project was as a partner with Fargo…" then it would reduce Fargo's damages claims significantly. In not disclosing the secret 2007 Consulting Agreement and amendments and failing to correct Fargo's counsel on numerous occasions when he misrepresented their relationship to the Arbitrator and to Infratech, "McConnell said, without any seeming remorse, 'I chose not to.' Mr. Park obviously kept silent as well, hoping Infratech would not press the issue and find out about the attempted $3+ million scam."

e.  The Arbitrator found that Park was not a credible witness, and found Park's responses "showed he was either not telling the truth, or grossly incompetent, or wanted to perform as if 'brain dead' (which he did)

when asked questions about key emails … and discussions with [Ravi] regarding their financial arrangement under this contract."

74.     Fargo, Park and McConnell perpetrated a fraud on the United Stated beginning on November 16, 2007, when they signed the 2007 Consulting Agreement, in order to illegally obtain the 2006 IDIQ Contract and 2009 IDIQ Contract that were set aside for 8(a) and HUBZone, and continue to defraud and cheat the United States to the present date.

75.     This was actionable fraud perpetrated by Fargo to illegally obtain government contracts. Under 13 CFR § 124.5132, SBA 8(a) participants cannot form a joint venture with a firm that is not an 8(a) concern unless the joint venture meets specific conditions and that joint venture is approved by the SBA. *See* 13 CFR § 124.513 (captioned "Under what circumstances can a joint venture be awarded an 8(a) contract?").

76.     It is undisputed that the defendants did not request the SBA's approval for their joint venture prior to the award of the contracts.

77.     Park and McConnell did everything they could to keep the joint venture a secret, including repeatedly denying the existence of the written agreements establishing the joint venture. The information only came to light when defendants were required to produce documents during the Arbitration.

78.     Park admitted when examined by the Arbitrator, and which the Arbitrator found, that he and McConnell were fully aware that their agreement violated 13 CFR § 124.513. This was why Paragraph 20 of the Consulting Agreement stated that the "terms of this agreement will be kept confidential by both parties." The 2007 Consulting Agreement was a secret agreement that was not disclosed to the SBA or the United States, and Jay Park

Case 1:17-cv-00096   Document 20   Filed 05/30/19   Page 19 of 35

testified under oath in the Arbitration proceedings that he knew that if such an arrangement was disclosed to the SBA, it would not qualify under SBA rules for minority preference.

79.     The lack of disclosure was material to the United States' decision to award the 2006 IDIQ Contract and 2009 IDIQ Contract to Fargo. Had Fargo disclosed the secret joint venture Consulting Agreement to the SBA and/or sought SBA approval, which Jay Park admittedly did not do, the SBA could not have approved the joint venture established in the Consulting Agreement. The reason the relationship was kept secret is that Park and McConnell knew it did not meet the requirements of § 124.513(c).

80.     For instance, contrary to § 124.513(c)(3)'s requirement that Fargo "own at least 51% of the joint venture entity", the Consulting Agreement (including amendments) evidences Fargo and McConnell's ongoing agreement to be 50-50 partners and/or a de facto joint venture in a fraudulent scheme to defraud the Government and to circumvent SBA and federal law relating to Government contracting.

81.     Additionally, contrary to § 124.513(c)(2)'s requirement that Fargo be designated the "managing venturer of the joint venture" and that an employee of Fargo serve as "the project manager", the Consulting Agreement designated McConnell as the manager of the joint venture. *See, e.g.,* 2007 Consulting Agreement, § 13 (stating that McConnell "will manage all aspects of the project in a manner similar to which he is currently doing so for Western Roofing Service, ie. Pricing Task Orders, ordering materials, supervising field management, securing Manufacturers Warranties, insuring contract compliance, etc." (emphasis added)). This arrangement was contrary to the Management Plan and Teaming Agreement that Fargo had submitted.

20

## COUNT ONE

### False Claims in Obtaining 2006 IDIQ Contract
### 31 U.S.C. §3729(a)

82.     Relator restates and incorporates by reference the allegations contained in paragraphs 1 through 81 of the First Amended Complaint as though fully set forth herein.

83.     The 2006 IDIQ Contract was awarded to Fargo in 2006, and on November 16, 2007, McConnell and Fargo entered into the 2007 Consulting Agreement regarding the 2006 IDIQ Contract.

84.     The 2007 Consulting Agreement evidences Fargo and McConnell's agreement to be 50-50 partners and/or in a *de facto* joint venture in a fraudulent scheme to defraud the Government and to circumvent SBA and federal law relating to Government contracting.

85.     The 2007 Consulting Agreement, as amended, was still in effect as of September 2016, and confirms Fargo and McConnell's responsibilities under this illegal arrangement:

    a.     Fargo will continue to execute the work on the various task order projects as they had done in the prior WRI contracts.

    b.     Fargo will purchase a truck, equipment and tools for the task order projects.

    c.      McConnell will manage all aspects of the task order projects as he has and is doing for his employer, WRI, which includes "ordering materials, supervising field management, security Manufacturer Warranties, insuring contract compliance, etc." and will not receive a salary, but will receive 50% of the partnership Gross Profit.

21

d.     Major material purchases, such as roof coating materials, will be purchased through McConnell's credit cards, and Fargo will pay McConnell's credit cards for these material purchases and book the credit card payments as direct task order job costs.

e.     Fargo will provide McConnell with copies of all invoices and checks issued by Fargo as part of the task order job costs "so that they may be approved [by McConnell] and included in the Gross Profit spreadsheet" prepared and maintained by McConnell.

f.     This 2007 Consulting Agreement and amendments were kept a secret from the public, including the United States, the Arbitrator, and the subcontractors it worked with.

g.     Fargo maintained the accounting books for the task orders and financials. However, Fargo's audited financial statements for the years in which it was paid for work performed on task orders issued under the 2006 IDIQ Contract and the 2009 IDIQ Contract, do not disclose the existence of the 2007 Consulting Agreement (a required disclosure under the Accounting Standards Codification 850 requiring Related Party Disclosures regarding material contacts) or the 50-50 partnership split of Gross Profits.

86.     Fargo and McConnell entered into the 2007 Consulting Agreement and amendments with the specific intent to subvert SBA regulations regarding minority ownership and control, so that McConnell (a person who is not of Asian descent) can illegally control and obtain 50% of Gross Profits of an 8(a) set aside contract.

22

87.    McConnell had an illegal interest in the 2006 IDIQ Contract, which was not disclosed to the United States, and when he and Fargo obtained the 2006 IDIQ Contract, it was never their intention to follow the SBA regulations regarding these special set aside contracts.

88.    The false or fraudulent statements by Fargo and McConnell were material to the Navy's decision to award the 2006 IDIQ Contract to Fargo.

89.    Were it not for Fargo's and McConnell's false or fraudulent statements, Fargo would not have been awarded the 2006 IDIQ Contract.

90.    Fargo's and McConnell's false or fraudulent statements, as set forth above, each constituted false claims within the meaning of 31 U.S.C. §3729(a)(1)(A) and (a)(1)(B), and constitute separate violations of the False Claims Act.

91.    As a direct and proximate result of the false and fraudulent statements as set forth above, the United States sustained damage in the full amount of the 2006 IDIQ Contract.

92.    The United States is entitled to treble damages based upon the amount of damage sustained by the United States as a result of Fargo's and McConnell's violation of 31 U.S.C. §3729.

93.    The United States is further entitled to recovery of the civil penalty of between $5,500 and $11,000 as required by 31 U.S.C. §3729(a) for each violation of the False Claims Act by Fargo and McConnell.

94.    Relator is entitled to reasonable attorneys' fees and costs pursuant to 31 U.S. C. §3730(d)(1).

## COUNT TWO

### Fargo Made False Claims in Connection With
### 2006 IDIQ Contract (31 U.S.C. §3729)

95.     Relator restates and incorporates by reference the allegations contained in paragraphs 1 through 94 of this First Amended Complaint as though fully set forth herein.

96.     During the 2006 IDIQ Contract Period, Fargo and McConnell were partners and/or *de facto* joint venturers, and had joint responsibility for approval and submission of payment applications to the United States, which contained false or fraudulent statements, because Fargo and McConnell knew that at the time these payment applications were submitted, Fargo did not qualify under the 8(a) status requirements because of their secret Consulting Agreement and the amendments.

97.     The 2006 IDIQ Contract was awarded in 2006.  The earliest task order was signed on or about October 24, 2006, and the last task order was completed on or about March 1, 2010 (the "2006 IDIQ Contract Period").

98.     Each payment application submitted by Fargo on each task order issued under the 2006 IDIQ Contract (an SBA 8(a) set aside contract) was a false or fraudulent statement, knowingly made and presented to the United States, concerning the Fargo's 8(a) status as set forth above.

99.     Fargo and McConnell jointly prepared and submitted payment applications for each of the task orders issued under the 2006 IDIQ Contract for the purpose of and with the specific intent to subvert SBA regulations regarding minority ownership and control, so that McConnell (a person who is not of Asian descent) can illegally control and obtain 50% of Gross Profits of an 8(a) set aside contract.

24

100.     The false or fraudulent statements by McConnell and Fargo were the false certifications on each Contractor Invoice certifying that Fargo complied with FAR 52.232.5, and that the amounts requested were for performance *in accordance with the specifications, terms, and conditions of its contract*.

101.     Fargo also made false statements when it reported and certified in the 8(a) Annual Update (SBA Form 1450), in response to Question 12 "Attachment C" regarding how Fargo, for each 8(a) contract performed during the year its "performance of work requirements are being met (or were met) for the contract" under 13 C.F.R. § 124.112(b)(8), which included and explanation of how Fargo "performed as the prime contractor and that [Fargo] … performed as part of a joint venture, as referenced in question #15 below."

102.     Fargo also made false statements when it certified in the 8(a) Annual Update that it remains eligible for the 8(a) Business Development program, and that there have been no changes to any information submitted in its applications for admission, and that there have been no subsequent changes to the application or any supplemental information submitted to the SBA.

103.     Fargo also made false statements when it certified that "all information submitted in the 8(a) Annual Update, attachments and personal financial statements were true, correct and accurate" from 2007 to 2011, when it graduated from the 8(a) Business Development Program.

104.     Fargo also made false statements when it reported and certified in response to Question 15 on the 8(a) Annual Update that it did not participate in a "joint venture", and failed to disclose the existence of the 2007 Consulting Agreement and amendments.

105.     The false certifications made by Fargo were material to the United States'
decision to pay Fargo for the work performed on each of the task orders issued under the 2006
IDIQ Contract.

106.     Were it not for Fargo's false or fraudulent statements, the United States would
not have paid Fargo.

107.     Fargo with the assistance of McConnell, submitted numerous payment
applications for a total of thirty-one (31) task orders issued under the 2006 IDIQ Contract, and
was paid approximately $9.68 Million.

108.     Fargo submitted 8(a) Annual Updates from 2007 to 2011, which contained
numerous false statements as discussed above.

109.     As part of the scheme, all payments by the United States made under the 2006
IDIQ Contract were received and controlled by Fargo, and then disbursed to McConnell in
accordance with the secret 2007 Consulting Agreement and amendments.

110.     All requests for payment prepared by the Fargo and McConnell partnership
and/or *de facto joint venture* acting through Fargo that were submitted on the 2006 IDIQ
Contract, were tainted and made possible by Fargo and McConnell's knowingly false and
fraudulent statements made in connection with each payment application. These requests for
payment are derived from the original knowingly false and fraudulent statements and are
therefore actionable false claims.

111.     Fargo and McConnell's false statements and subsequent submissions of
payment applications on each of the thirty one (31) task orders, as set forth above, each
constituted false claims within the meaning of 31 U.S.C. §3729(a)(1)(A) and (a)(1)(B), and
constitute separate violations of the False Claims Act.

112.    Fargo and McConnell's false statements and subsequent submissions of the 8(a) Annual Updates, as set forth above, each constituted false claims within the meaning of 31 U.S.C. §3729(a)(1)(A) and (a)(1)(B), and constitute separate violations of the False Claims Act.

113.    As a direct and proximate result of the false and fraudulent statements as set forth above, the United States sustained damage in the full amount of the 2006 IDIQ Contract.

114.    The United States is entitled to $9.68 million, which is the full amount of the 2006 IDIQ Contract under the Small Business Jobs Act of 2010 and the "Presumed Loss Rule", as its damages based upon the amount of damage sustained by the United States as a result of Fargo's violation of 31 U.S.C. §3729.

115.    That Fargo be ordered to pay civil penalties of $5,500 to $11,000 for each violation of 31 U.S.C. §3729, with interest, including the costs of the United States for its expenses related to this action.

116.    Relator is entitled to reasonable attorneys' fees and costs pursuant to 31 U.S.C. §3730(d)(1).

**COUNT THREE**

**Fargo Made Numerous False Claims in Obtaining**
**2009 IDIQ Contract (31 U.S.C. §3729(a))**

117.    Relator restates and incorporates by reference the allegations contained in paragraphs 1 through 116 of this First Amended Complaint as though fully set forth herein.

118.    The 2009 IDIQ Contract was awarded to Fargo in 2009, and Fargo and McConnell entered into the First Amendment Agreement on September 3, 2009.

27

119.     The 2007 Consulting Agreement and the First Amendment Agreement evidences Fargo and McConnell's agreement to be 50-50 partners **and/or** a *de facto* **joint venture** in a fraudulent scheme to defraud the Government and to circumvent SBA and federal law relating to Government contracting.

120.     The 2007 Consulting Agreement, as amended, was still in effect as of September 2016.

121.     McConnell had an illegal interest in the 2009 IDIQ Contract which was not disclosed to the United States, and when they obtained the 2009 IDIQ Contract, it was never their intention to follow the SBA regulations regarding the special set aside contract requirement.

122.     Fargo and McConnell entered into the 2007 Consulting Agreement and the Second Amendment Agreement for the purpose of, and with the specific intent to subvert SBA regulations regarding minority ownership and control, so that McConnell (a person who is not of Asian descent) can illegally obtain 50% of Gross Profits of an 8(a) set aside contract.

123.     Were it not for Fargo's and McConnell's false or fraudulent statements, Fargo would not have been awarded the 2009 IDIQ Contract.

124.     Fargo's and McConnell's false or fraudulent statements, as set forth above, each constituted false claims within the meaning of 31 U.S.C. §3729(a)(1)(A) and (a)(1)(B), and constitute separate violations of the False Claims Act.

125.     As a direct and proximate result of the false and fraudulent statements as set forth above, the United States sustained damage in the full amount of the 2009 IDIQ Contract.

126.    The United States is entitled to treble damages based upon the amount of damage sustained by the United States as a result of Fargo's and McConnell's violation of 31 U.S.C. §3729.

127.     The United States is further entitled to recovery of the civil penalty of between $5,500 and $11,000 as required by 31 U.S.C. §3729(a) for each violation of the False Claims Act by Fargo and McConnell.

128.    Relator is entitled to reasonable attorneys' fees and costs pursuant to 31 U.S. C. §3730(d)(1).

## COUNT FOUR

### Fargo Made False Claims in Connection With
### 2009 IDIQ Contract (31 U.S.C. §3729)

129.    Relator restates and incorporates by reference the allegations contained in paragraphs 1 through 128 of this First Amended Complaint as though fully set forth herein.

130.    Each payment application submitted by Fargo on each task order issued under the 2009 IDIQ Contract (an SBA 8(a) set aside contract) was a false or fraudulent statement, knowingly made and presented to the United States, concerning the Fargo's 8(a) status as set forth above.

131.    The 2009 IDIQ Contract was awarded in 2009.  The first task order was signed on or about September 16, 2009.  The task orders issued under the 2009 IDIQ Contract were completed on or about September 21, 2013 (the "2009 IDIQ Contract Period").

132.    During the 2009 IDIQ Contract Period, Fargo and McConnell were partners and/or in a *de facto* joint venturers and had joint responsibility for approval and submission of payment applications to the United States, which contained false or fraudulent statements,

29

because Fargo and McConnell knew that at the time these payment applications were submitted, Fargo did not qualify under the 8(a) status requirements because of their secret 2007 Consulting Agreement and the amendments.

133.   Fargo and McConnell jointly prepared and submitted payment applications for each of the task orders issued under the 2009 IDIQ Contract for the purpose of, and with the specific intent to subvert SBA regulations regarding minority ownership and control, so that McConnell (a person who is not of Asian descent) can illegally obtain 50% of Gross Profits of an 8(a) set aside contract.

134.   The false or fraudulent statements by McConnell and Fargo were the false certifications on each Contractor Invoice certifying that Fargo complied with FAR 52.232.5, and that the amounts requested were for performance *in accordance with the specifications, terms, and conditions of its contract*.

135.   Fargo also made false statements when it reported and certified in the 8(a) Annual Update (SBA Form 1450), in response to Question 12 "Attachment C" regarding how Fargo, for each 8(a) contract performed during the year of its "performance of work requirements are being met (or were met) for the contract" under 13 C.F.R. § 124.112(b)(8), which included and explanation of how Fargo "performed as the prime contractor and that [Fargo] … performed as part of a joint venture, as referenced in question #15 below."

136.   Fargo also made false statements when it certified in the 8(a) Annual Update that it "remains eligible for the 8(a) Business Development program, and that there have been no changes to any information submitted in its applications for admission, and that there have been no subsequent changes to the application or any supplemental information submitted to the SBA.

30

137.     Fargo also made false statements when it certified that "all information submitted in the 8(a) Annual Update, attachments and personal financial statements were true, correct and accurate" from 2007 to 2011 when it graduated from the 8(a) Business Development Program.

138.     Fargo also made false statements when it reported and certified in response to Question 15 on the 8(a) Annual Update that it did not participate in a "joint venture", and failed to disclose the existence of the 2007 Consulting Agreement and amendments.

139.     The false certifications made by Fargo were material to the United States' decision to pay Fargo for the work performed on each of the task orders issued under the 2009 IDIQ Contract.

140.     Were it not for Fargo's false or fraudulent statements, the United States would not have paid Fargo.

141.     Fargo with the assistance of McConnell, submitted numerous payment applications for a total of forty-six (46) task orders issued under the 2009 IDIQ Contract, and was paid approximately $20.4 Million.

142.     Fargo submitted 8(a) Annual Updates from 2007 to 2011, which contained numerous false statements as discussed above.

143.     As part of the scheme, all payments by the United States made under the 2009 IDIQ Contract were received and controlled by Fargo, and then disbursed to McConnell in accordance with their secret 2007 Consulting Agreement and amendments.

144.     All requests for payment prepared by Fargo and McConnell in partnership and/or in a *de facto* joint venture acting through Fargo that were submitted on the 2009 IDIQ Contract, were tainted and made possible by Fargo and McConnell's knowingly false and

fraudulent statements made in connection with each payment application. These requests for payment are derived from the original knowingly false and fraudulent statements and are therefore actionable false claims.

145.    Fargo and McConnell's false statements and subsequent submissions of numerous payment applications on forty-six (46) task orders, as set forth above, each constituted false claims within the meaning of 31 U.S.C. §3729(a)(1)(A) and (a)(1)(B), and constitute separate violations of the False Claims Act.

146.    As a direct and proximate result of the false and fraudulent statements as set forth above, the United States sustained damage in the full amount of the 2009 IDIQ Contract.

147.    The United States is entitled to $20.4 million, which is the full amount of the 2009 IDIQ Contract under the Small Business Jobs Act of 2010 and the "Presumed Loss Rule", as its damages based upon the amount of damage sustained by the United States as a result of Fargo's violation of 31 U.S.C. §3729.

148.    That Fargo be ordered to pay civil penalties of $5,500 to $11,000 for each violation of 31 U.S.C. §3729, with interest, including the costs of the United States for its expenses related to this action.

149.    Relator is entitled to reasonable attorneys' fees and costs pursuant to 31 U.S. C. §3730(d)(1).

//
//

## PRAYER FOR RELIEF

WHEREFORE, the Relator, on behalf of himself and the United States, requests the following relief:

**1.      On Counts One and Two:**

A.      That Judgment be entered against Fargo for the damage the United States has sustained in the amount not less than the value of the 2006 IDIQ Contract of $9.68 million, or such other amounts to be proven at trial;

B.      That Fargo be ordered to pay civil penalties of $5,500 to $11,000 for each violation of 31 U.S.C. §3729, with interest, including the costs of the United States for its expenses related to this action; and

C.      That Relator be awarded all costs incurred, including reasonable attorneys' fees.

**2.      On Counts Three and Four:**

A.      That Judgment be entered against Fargo for the damage the United States has sustained in the amount not less than the value of the 2009 IDIQ Contract of $20.4 million, or such other amounts to be proven at trial;

B.      That Fargo be ordered to pay civil penalties of $5,500 to $11,000 for each violation of 31 U.S.C. §3729, with interest, including the costs of the United States for its expenses related to this action; and

**C.**      That Relator be awarded all costs incurred, including reasonable attorneys' fees.

3.      **On All Counts:**

A.      That in the event the United States intervenes in this action, the Relator be awarded 25%, but in no event less than 15%, of the proceeds of the resulting judgment in or settlement of this action;

B.      That in the event the United States does not intervene in this action, the Relator be awarded 30%, but in no event less than 25%, of the proceeds of the resulting judgment in or settlement of this action;

C.      That the Relator and the United States be awarded prejudgment interest; and

D.      That the United States and the Relator receive all relief both at law and at equity as this Court deems appropriate.

DATED at Hagåtña, Guam, this 30th day of May, 2019.

**CIVILLE & TANG, PLLC**

By:  */s/ G. Patrick Civille*
      **G. PATRICK CIVILLE**
      **JOYCE C.H. TANG**
      *Attorneys for Plaintiff/Relator*

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff/Relator hereby demands a trial by jury of twelve (12) people.

DATED at Hagåtña, Guam, this 30th day of May, 2019.

**CIVILLE & TANG, PLLC**

By: */s/ G. Patrick Civille*
    **G. PATRICK CIVILLE**
    **JOYCE C.H. TANG**
    *Attorneys for Plaintiff/Relator*

Case 1:17-cv-00096   Document 20   Filed 05/30/19   Page 35 of 35