Thomas C. Sterling, Esq.
BLAIR STERLING JOHNSON & MARTINEZ
A Professional Corporation
Suite 1008, DNA Building
238 Archbishop F.C. Flores Street
Hagåtña, Guam 96910-5205
Telephone: (671) 477-7857
Facsimile: (671) 472-4290
Email: tcsterling@bsjmlaw.com

CROWELL & MORING LLP
Brian Tully McLaughlin (pro hac vice)
Jason M. Crawford (pro hac vice)
Sarah A. Hill (pro hac vice)
1001 Pennsylvania Ave NW
Washington, DC 20004
Telephone: (202) 624-2628
Facsimile: (202) 628-5116

Attorneys for Defendants
FARGO PACIFIC INC., EDGAR L. MCCONNELL,
and JAY S.H. PARK

## IN THE DISTRICT COURT OF GUAM

## TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* and RAVINDRA GOGINENI, <br><br> Plaintiffs/Relator, <br><br> v. <br><br> FARGO PACIFIC INC., EDGAR L. MCCONNELL, and JAY S.H. PARK, <br><br> Defendants. | Case No. 17-0096 <br><br> **DEFENDANTS FARGO PACIFIC INC., EDGAR L. MCCONNELL, AND JAY S.H. PARK'S MOTION TO DISMISS RELATOR'S FIRST AMENDED COMPLAINT UNDER FEDERAL RULES OF CIVIL PROCEDURE 9(b) AND 12(b)(6)** |

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... ii

TABLE OF AUTHORITIES ................................................................................... iii

I.   INTRODUCTION .......................................................................................... 1

II.  STATEMENT OF FACTS ............................................................................ 2

    A.  The SBA's 8(a) Business Development Program and the Roofing IDIQ
        Contracts ............................................................................................... 2

    B.  Relator's Allegations ............................................................................. 4

    C.  Procedural History ................................................................................ 5

III. LEGAL STANDARD .................................................................................... 6

IV.  ARGUMENT ................................................................................................ 7

    A.  The FAC Fails to Plead the Elements of a Claim for Relief .................. 7

        1.  The FAC is Premised on a Flawed Theory of Falsity .................. 8

            a.  The Facts Alleged in the FAC Fail to Establish an "Illegal"
                Agreement ........................................................................... 8

            b.  A reference to a "*de facto* joint venture" in the arbitration
                does not establish a violation of the SBA's 8(a) regulations ....... 10

            c.  McConnell Did Not "Control" FPI ...................................... 12

        2.  The FAC Fails to Allege That Any Claims were "Knowingly" False ...... 15

        3.  The Complaint Fails to Allege Materiality .............................. 17

        4.  The FAC Lacks Reliable Indicia that Lead to a Strong Inference
            that False Claims were Actually Submitted for Payment ........................ 20

    B.  Count I and Allegations About Conduct Prior to November 28, 2007 Lack
        Plausibility ........................................................................................... 21

    C.  Relator Fails to Plead with Particularity the Who, What, When, Where, and
        How of the Alleged Fraud as Required Under Rule 9(b) ..................... 21

    D.  Any Claims for Payment Submitted Prior to August 24, 2007 are Time-
        Barred ................................................................................................. 22

V.   CONCLUSION ............................................................................................ 23

# TABLE OF AUTHORITIES

**Cases**

*A1 Procurement, LLC v. Thermcor, Inc.*, No. 2:15cv15, 2017 WL 2881350 (E.D. Va. July 5, 2017) ........................................................................................................................... 19

*Ashcroft v. Iqbal*, 556 U.S. 662, (2009) ........................................................................... 6

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................ 6

*Bly-Magee v. Cal.*, 236 F.3d 1014 (9th Cir. 2001)................................................... 6, 21

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507 (2019)......................... 23

*Desa Grp., Inc. v. U.S. Small Bus. Admin.*, 190 F. Supp. 3d 61 (D.D.C. 2016) ............................ 14

*Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993 (9th Cir. 2010) ............................... 6, 20, 22

*Hagood v. Sonoma Cty. Water Agency*, 81 F.3d 1465 (9th Cir. 1996)......................................... 17

*LaSalle Partners v. United States*, 48 Fed. Cl. 797 (2001) ............................................... 9

*Matter of SAM Facilities Mgmt., Inc.*, SBA No. BDP-194 (2003)................................................. 3

*Metro Mach. Corp. v. U.S. Small Bus. Admin.*, 305 F. Supp. 2d 614 (E.D. Va. 2004) ................ 11

*Moss v. United States Secret Serv.*, 572 F.3d 962 (9th Cir. 2009)........................................... 6

*Saavedra v. Donovan*, 700 F.2d 496 (9th Cir. 1983) ......................................................... 16

*Size Appeal of: Olgoonik Diversified Servs., LLC*, SBA No. SIZ-5825, 2017 (2017) .................. 11

*State of California ex rel. Mueller v. Walgreen Corp.*, 175 F.R.D. 631 (N.D. Cal. 1997)............ 22

*United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047 (9th Cir. 2011)... 6, 7

*United States ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166 (9th Cir. 2006).................. 8, 16, 17

*United States ex rel. Hopper v. Anton*, 91 F.3d 1261 (9th Cir. 1996)..................................... 17, 20

*United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013 (7th Cir. 1999) ..................... 17

*United States ex rel. Mateski v. Raytheon Co.*, No. 2:06-cv-03614-ODW(KSx), 2017 WL 1954942 (C.D. Cal. Feb. 10, 2017) .......................................................................... 22

*United States ex rel. McCoy v. California Medical Review, Inc.*, 723 F. Supp. 1363 (N.D. Cal. 1989) .................................................................................................................... 22

*United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281 (D.C. Cir. 2015)................................ 17

*United States ex rel. Raynor v. Nat'l Rural Utils. Coop. Fin., Corp.*, 690 F.3d 951 (8th Cir. 2012) ................................................................................................................................. 15

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370 (4th Cir. 2008) ......... 15

*United States v. Corinthian Colls.*, 655 F.3d 984 (9th Cir. 2011) ................................................ 15

iii

*United States v. Kitsap Physicians Serv.*, 314 F.3d 995 (9th Cir. 2002) ........................................ 20

*United States v. Strock*, No. 15-CV-0887-FPG, 2018 WL 647471 (W.D.N.Y. Jan. 31, 2018)..... 18

*Universal Health Servs., Inc. v. United States ex rel Escobar*, 136 S. Ct. 1989 (2016) .......... 18, 19

**Statutes**

15 U.S.C. § 631(f)(2)(A-C) ............................................................................................................ 3

31 U.S.C. § 3729(a)(1)(A) ............................................................................................................. 7

31 U.S.C. § 3729(a)(1)(B) ............................................................................................................. 7

31 U.S.C. § 3729(a)(2) .................................................................................................................. 7

31 U.S.C. § 3729(b) .................................................................................................................... 15

31 U.S.C. § 3731(b)(1) ................................................................................................................ 23

31 U.S.C. § 3731(b)(2) ................................................................................................................ 23

**Rules**

13 C.F.R. § 121 ............................................................................................................................. 3

13 C.F.R. § 124 ............................................................................................................................. 3

13 C.F.R. § 124.101 ...................................................................................................................... 4

13 C.F.R. § 124.103 ...................................................................................................................... 4

13 C.F.R. § 124.104 ...................................................................................................................... 4

13 C.F.R. § 124.106 ....................................................................................................... 4, 12, 13, 14

13 C.F.R. § 124.106(a)(1) ............................................................................................................. 4

13 C.F.R. § 124.106(a)(2) ........................................................................................................... 12

13 C.F.R. § 124.106(d)(1)(ii) ...................................................................................................... 12

13 C.F.R. § 124.106(e) .................................................................................................................. 4

13 C.F.R. § 124.106(e)(1) ........................................................................................................... 13

13 C.F.R. § 124.106(g)(4) ........................................................................................................... 14

13 C.F.R. § 124.3 .......................................................................................................................... 3

13 C.F.R. § 124.513 .................................................................................................................. 8, 10

13 C.F.R. § 124.513(c)(3) ............................................................................................................. 9

48 C.F.R. § 36.102 ........................................................................................................................ 3

Federal Rules of Civil Procedure 12(b)(6) ............................................................................ 5, 7, 23

Federal Rules of Civil Procedure 8(a)(2) ................................................................................... 23

Federal Rules of Civil Procedure 9(b) ................................................ 1, 6, 7, 21, 22, 23

**Other Authorities**

FAR 31.205 Cost Principles, Chap. 37 ............................................................. 9

*Restatement (Second) of Contracts* § 203, comment c (1981) ...................................... 16

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Relator Ravindra Gogineni (Relator) brings this False Claims Act suit based on a fundamental misreading of the Small Business Administration (SBA) regulations governing the 8(a) program and lingering resentment towards Fargo Pacific Inc. (FPI) in connection with a prior dispute between FPI and Relator's company, InfraTech. Still stung by FPI's $1.75M arbitration award against InfraTech, Relator relies on statements from the arbitration proceeding to support his allegation that FPI, Edgar McConnell, and Jay Park (collectively, Defendants) committed fraud on the government. But even when Relator's allegations are taken at face value, the First Amended Complaint (FAC) must be dismissed because it fails to establish any of the four *prima facie* elements of a False Claims Act claim for relief, much less satisfy the heightened pleading requirements of Rule 9(b) that are applicable in cases alleging fraud.

Falsity: The FAC's theory of falsity—a fundamental and necessary element of a False Claims Act claim for relief—is based on Relator's misinterpretation of the underlying 8(a) regulations. Relator relies on conclusory statements about an "illegal agreement," and the FAC fails to allege particularized facts to establish that McConnell was in "control" of FPI. Nor has Relator set forth allegations that would establish that FPI and McConnell were equal partners or *de facto* joint venturers as those terms are understood in the context of government contracting.

Knowledge: Relator has not alleged facts that would demonstrate that Defendants had knowledge of any purported falsity. Comprised of mere conclusory assertions of knowledge, the FAC fails to support an inference that any of the Defendants knew that their alleged partnership would somehow cause FPI's claims or contract proposals to be false for failing to comply with the SBA's 8(a) provisions. Moreover, even under the most favorable interpretation of the FAC, Relator's allegations turn on disputed questions concerning whether FPI and McConnell formed a

-1-

"joint partnership" or a "*de facto* joint venture." Because the question of whether FPI and McConnell formed a *de facto* joint venture could be reasonably interpreted in more than one way—as evidenced by the arbitration between FPI and InfraTech—Relator has failed to plead the requisite knowledge.

Materiality: Even if Relator had alleged a regulatory violation—and he has not—the FAC would still need to be dismissed for failure to properly plead that compliance with a particular SBA requirement was material to the Navy's decision to pay FPI. Here, the FAC does little more than pay lip service to the materiality element of the False Claims Act.

Claim for Payment: Relator also fails to tether his allegations of SBA noncompliance to any actual claim for payment – the *sine qua non* of a False Claims Act violation.

Lastly, it is apparent from the four corners of the FAC that any claims for payment made before August 24, 2007, are time-barred because they fall outside of the False Claims Act's statute of limitations.

For all of these reasons, the FAC must be dismissed.

## II.  STATEMENT OF FACTS

### A.  The SBA's 8(a) Business Development Program and the Roofing IDIQ Contracts

FPI is a family-owned business based in Tamuning that specializes in government, residential, and commercial construction throughout Guam and Saipan. The company was founded in 1975 (FAC ¶ 17) and is one of the oldest local construction companies in operation on Guam. Jay Park became the President and General Manager of FPI on January 1, 2001 (*id*.) and owns more than 51% of the company. FAC ¶ 19.

As a "general contractor" (FAC ¶ 17), FPI has held various types of construction contracts including design-build multiple award construction contracts under which FPI has performed a

range of construction tasks.[1]  *See* ECF No. 1 at p. 49 (referencing HUBZone design-build multiple award construction contract N40192-16-D-2702).  The allegations in the FAC focus primarily on two Naval Facilities Engineering Command (NAVFAC) indefinite delivery/indefinite quantity (IDIQ) roofing contracts that were set-aside for participants in the SBA's 8(a) Business Development program.  These contracts were awarded to FPI in 2006 and 2009—*i.e.*, Contract Nos. N40192-06-D-2540 and N40192-09-D-2710.  FAC ¶¶ 2, 83, 118.

The 8(a) program provides participant[2] small businesses with training and technical assistance designed to enhance their ability to compete effectively in the private marketplace.  One of the program's benefits is that 8(a) firms can receive federal contracting preferences in the form of set-aside and sole-source awards.  The regulations governing the 8(a) program can be found at 13 C.F.R. § 124.  In addition to the SBA rules, 8(a) participants are expected to comply with relevant requirements from the Federal Acquisition Regulation (FAR) which governs the federal government's purchasing process.

The purpose of the 8(a) program is to promote the development of the participating 8(a) businesses so that they can gain the necessary experience, develop their workforce, and self-perform when they graduate at the end of the nine-year program.  *See* 15 U.S.C. § 631(f)(2)(A-C); *see also Matter of SAM Facilities Mgmt., Inc.*, SBA No. BDP-194, at 10 (2003).

To be admitted into the 8(a) program, a company must be both: (1) a small business concern;[3] and (2) owned and controlled by a socially and economically disadvantaged individual

---

[1]  A design-build contract is used to deliver a project in which the design and construction services are contracted by a single entity.  *See* 48 C.F.R. § 36.102.

[2]  The regulations define participant as "a small business concern admitted to participate in the 8(a) BD program."  13 C.F.R. § 124.3.

[3] Size standards define the largest size a business can be to participate in government contracting programs and compete for contracts reserved or set aside for small businesses. Size standards vary by industry, and are generally based on the number of employees or the amount of annual receipts the business has.  The regulations governing the SBA size standards can be found at 13 C.F.R. § 121. There are no allegations in the FAC that FPI was not small.

as defined in the SBA regulations. 13 C.F.R. § 124.101; §§ 124.103–104. FPI met these criteria and the company was accepted into the 8(a) program in 2002. FAC ¶ 18.

Under the 8(a) regulations, non-disadvantaged or immediate family members are not allowed to exercise control over the 8(a) participant. *Id.* § 124.106(e) . According to 13 C.F.R. § 124.106, the "SBA regards control as including both the strategic policy setting exercised by boards of directors and the day-to-day management and administration of business operations." Under this regulation, a disadvantaged individual must hold the highest officer position within the participant company (usually President or Chief Executive Officer) and must manage the company on a full-time basis. *Id.* § 124.106(a)(1) . A non-disadvantaged individual may be involved in the management of the company—for example as a subcontractor, project manager, or consultant—so long as that individual does not exercise actual control or have the power to control the 8(a) participant company. *See id.* § 124.106(e) .

**B.    Relator's Allegations**

On November 28, 2007, FPI entered into a Consulting Agreement with Edgar McConnell.[4]  Under the Consulting Agreement and its subsequent amendments, McConnell agreed to assist FPI in self-performing roofing work. FAC ¶ 32. Because of McConnell's expertise and ability to source roofing materials competitively, FPI agreed to pay McConnell 50% of the gross profit from roofing task orders. *Id.*

Relator—a disgruntled former business partner who was never an employee of FPI—does not allege any first-hand knowledge of FPI's operations under the 2006 or 2009 contracts. Instead, he speculates that McConnell was not just a consultant to FPI but rather an equal partner or a *de facto* joint venturer. FAC ¶ 96. Relator further surmises that this equal partnership/*de*

---

[4]  Relator refers to a "November 16, 2007" Consulting Agreement. FAC ¶ 30. But according to Exhibit A to the FAC, the Consulting Agreement was not executed by the parties until November 28, 2007. ECF No. 20-1.

*facto* joint venture violated the requirements for participation in the 8(a) program such that FPI was awarded contracts to which it was not entitled to receive. FAC ¶¶ 38, 59. Based on these purported violations of the SBA's regulations, Relator asserts four counts of violations of the False Claims Act.

Count I alleges that FPI and McConnell made false statements regarding minority ownership and control, and that the company received the 2006 IDIQ Contract as a result of those false statements. FAC ¶¶ 82-94.[5] Count II alleges that while performing the 2006 IDIQ Contract, FPI submitted invoices to the government that falsely certified compliance with the specifications, terms, and conditions of the contract, and falsely certified in 8(a) Annual Update forms that it remained eligible for the 8(a) program. FAC ¶¶ 95-116. Counts III and IV make similar allegations of fraudulent inducement and false certification with respect to the 2009 IDIQ Contract. FAC ¶¶ 117-128 (Count III); *id.* ¶¶ 129-149 (Count IV).

## C.    Procedural History

Relator filed this *qui tam* action under seal on August 25, 2017.[6] ECF No. 1. On February 12, 2019, having reviewed the case while it was under seal, the United States—the real party in interest in cases brought under the False Claims Act—notified the Court that the United States declined its right to join the lawsuit and the case was unsealed. ECF Nos. 17, 18. On May 30, 2019, Relator filed the FAC. ECF No. 20. Relator seeks over $90M in damages plus statutory penalties. FAC ¶¶ 92, 126.

Under the False Claims Act, the FAC is subject to the pleading requirements of Rules 12(b)(6) (requiring a valid claim for relief), 8(a)(2) (requiring well-pleaded facts, not legal

---

[5] Relator fails to explain how a 2007 agreement between FPI and McConnell would have any impact on a contract that was awarded to FPI a year <u>earlier</u>. *See* discussion *infra* IV. B.

[6] Relator's wife, Pragathi Gogineni, was named as a relator in the initial complaint, but her name was removed when Relator filed the FAC. ECF Nos. 1, 20.

conclusions), and 9(b) (requiring that allegations of fraud be pled with particularity). Because the FAC falls short of these pleading standards, it must be dismissed.

## III. LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A complaint that alleges only the "mere possibility of misconduct" cannot form the basis of relief because such a complaint "stops short of the line between possibility and plausibility." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, (2009). *See also Moss v. United States Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief."); *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054-55 (9th Cir. 2011) ("In reviewing the dismissal of a complaint, we inquire whether the complaint's factual allegations, together with all reasonable inferences, state a plausible claim for relief.").

The heightened pleading requirements of Rule 9(b) also apply to False Claims Act complaints because the allegations sound in fraud. *Bly-Magee v. Cal.*, 236 F.3d 1014, 1018 (9th Cir. 2001) ("[C]omplaints brought under the [False Claims Act] must fulfill the requirements of Rule 9(b)—defendants accused of defrauding the federal government have the same protections as defendants sued for fraud in other contexts.").

Rule 9(b) requires a party to state with particularity the circumstances constituting fraud or mistake, including the "who, what, when, where, and how" of the misconduct charged. *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (affirming dismissal of FCA complaint because the relator failed to set out the who, what, when, where, and how of the alleged referrals) (internal citation omitted). Moreover, a relator must identify particular false claims or

-6-

allege factual details of a scheme to submit false claims paired with reliable indicia that claims were actually submitted. *Id.* at 998-99; *see also Cafasso*, 637 F.3d at 1056-57 (affirming dismissal of FCA complaint because relator had not identified any particular false claims or their attendant circumstances). Here, Relator does not (and cannot) meet the heightened pleading standard.

## IV.    ARGUMENT

Counts I-IV of the FAC allege that FPI violated the False Claims Act by presenting a false claim for payment under 31 U.S.C. § 3729(a)(1)(A) and by making or using false records or statements material to a false or fraudulent claim under § 3729(a)(1)(B) .[7]  These Counts must be dismissed under Rules 8(a), 9(b) , and 12(b)(6)  for failure to set forth a claim with the requisite plausibility and failure to plead fraud with particularity.  Additionally, all allegations based on claims for payment preceding August 24, 2007—must be dismissed as time-barred.

### A.    The FAC Fails to Plead the Elements of a Claim for Relief

In order to state a valid False Claims Act claim for relief, a complaint must sufficiently plead the following four required elements:

1. a false statement or fraudulent course of conduct,

2. made with knowledge,

3. that was material, and

---

[7]  In 2009, the Fraud Enforcement and Recovery Act (FERA) amended the False Claims Act and revised and renumbered key provisions including the false statement provision.  *See* Pub. L. 111-21.  The change applied to all claims for payment that were pending on or after June 7, 2008.  *See Cafasso*, 637 F.3d at 1051.  Here, the allegations in the FAC straddle the effective date of the FERA amendments, but Relator cites only the post-FERA version of the statute.  The pre-FERA version of the false statement provision established liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement <u>to get</u> a false or fraudulent claim paid or approved by the Government."  *See* 31 U.S.C. § 3729(a)(2) (emphasis added).  The FERA amendments eliminated the "to get" language and the post-FERA provision imposes liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B).

(Continued…)

4. caused the government to pay out money pursuant to a <u>claim</u>.

*United States ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1174 (9th Cir. 2006) (emphasis added).[8]  Here, by failing to adequately plead the *prima facie* elements of a False Claims Act violation, Relator has failed to state a claim for relief and the FAC must be dismissed.

### 1. The FAC is Premised on a Flawed Theory of Falsity

The gravamen of Relator's case is that the Consulting Agreement between McConnell and FPI created an equal partnership or a *de facto* joint venture that violated the SBA's control requirements.  *See, e.g.*, FAC ¶¶ 38, 67.  But this theory of falsity is based on Relator's fundamental misreading of the SBA's 8(a) regulations.

### a. The Facts Alleged in the FAC Fail to Establish an "Illegal" Agreement

Relator refers to an "illegal" agreement more than ten times throughout the complaint. FAC ¶¶ 28, 29, 30, 45, 46, 50, 51, 54, 58, 59, 85.  But merely describing the Consulting Agreement illegal does not make it so.  Relator's only basis for asserting that the Consulting Agreement was illegal is the allegation that the Agreement constituted a "de facto" joint venture that Defendants failed to disclose under 13 C.F.R. § 124.513.  But FPI could not conceal that which did not exist.

Relator alleges that the Consulting Agreement "conclusively" establishes that McConnell and FPI had formed a joint venture partnership that was required to be disclosed to the government (FAC ¶ 62), but the FAC is devoid of facts to support this *ipse dixit* allegation. Notably, Relator fails to explain why the Consulting Agreement between FPI and McConnell constitutes a joint venture rather than some other business arrangement such as a prime

---

[8]  Relator advances two theories of liability: fraud in the inducement and false certification.  Although these are distinct theories, the Ninth Circuit has stated that the essential elements of False Claims Act liability remain the same. *Hendow*, 461 F.3d at 1174.

contractor/subcontractor relationship, an independent contractor relationship, or—as the document explicitly states—a "consulting agreement." *See* FAC Ex. B, ECF No. 20-2.

Distinguishing between the various business arrangements that are used in the government contracts context—such as joint ventures and prime/sub agreements— requires a fact-intensive inquiry, which is why the Defense Contract Audit Agency (DCAA)[9] has issued guidance regarding the factors that government auditors should consider when determining whether a business agreement is, in fact, a joint venture.[10] These factors include, *inter alia*, whether the business arrangement provides for "joint liability for losses and expenses."[11] The DCAA Guidance further explains that on construction contracts, incorporated joint ventures (*i.e.* separate legal entities) are most common. *Id.* But there are no allegations in the FAC that FPI and McConnell formed a separate legal entity to perform the two IDIQ roofing contracts. Nonetheless, relying on his speculation that Defendants formed a joint venture, Relator conflates the 50/50 sharing of profit in the Consulting Agreement with the SBA's requirement at § 124.513(c)(3) that an 8(a) participant "own at least 51% of the joint venture entity." FAC ¶ 80. Here, where there was no separate legal entity, the profit sharing percentages are of no moment.[12]

Moreover, in both incorporated and unincorporated joint ventures, the joint venture is the contracting entity that is in privity of contract with the government. *See LaSalle Partners v.*

---

[9] The DCAA is the agency responsible for auditing Department of Defense contracts including NAVFAC contracts.

[10] DCAA Selected Areas of Cost Guidebook: FAR 31.205 Cost Principles, Chap. 37, *available at* https://www.dcaa.mil/Content/Documents/sac/Chapter37.pdf ("DCAA Guidance").

[11] Relator cites the 2007 Consulting Agreement and the October 27, 2015 Declaration (Attachment F) for the proposition that "the 2007 Consulting Agreement provided for shared control and shared profits and losses." FAC ¶ 62. But Relator misreads these documents. The Declaration does not reference the 2007 Consulting Agreement and the Declaration notes that there were "no losses" on the project to share. Moreover, in the arbitration—based on arguments successfully advanced by InfraTech—the arbitrator opted not to treat FPI and McConnell as a joint venture because the Consulting Agreement said nothing about sharing losses. ECF No. 20-8 at 5.

[12] Moreover, and as discussed *infra*, the FAC compares apples to oranges in assessing the significance of an agreement to share profits on certain task orders with the ownership of the entity itself.

-9-

*United States*, 48 Fed. Cl. 797, 805 (2001) (in case where the government contracted directly with one party and was not in privity of contract with the other party, the court found no joint venture). Here, there are no allegations that McConnell was in privity of contract with NAVFAC such that both FPI and McConnell would be liable for performance under the contract.

The FAC also suggests that the mere splitting of profit on specific task orders removes "any doubt as to the nature of the relationship" between McConnell and FPI (FAC ¶ 66), but the DCAA Guidance makes clear that the splitting of profits is just one factor to consider—a far cry from Relator's assertion that the 50/50 split of profit "conclusively" established the existence of a joint venture. Indeed, the DCAA Guidance explicitly states that "[n]ormally no one factor should be the sole determinant of whether the relationship is a joint venture or more closely resembles a prime contractor/subcontractor relationship." DCAA Guidance at 37-4. In sum, even when Relator's factual allegations are taken at face value, the FAC has failed to establish the existence of a joint venture such that 13 C.F.R. § 124.513 would even be applicable, and if there was no joint venture to be disclosed, there is no basis for Relator's allegation that the Consulting Agreement was "secret" or "illegal."

> **b.** **A reference to a "*de facto* joint venture" in the arbitration does not establish a violation of the SBA's 8(a) regulations**

Lacking support in the regulations, Relator points to statements made during the arbitration proceeding as evidence of his theory that Defendants entered into a joint venture. Namely, Relator alleges that Ronald Maus, Fargo's economic damages expert in the arbitration, opined that the agreement between FPI and McConnell was "in some fashion" a *de facto* joint venture. FAC ¶ 72. But the *post-hac* characterization of the relationship as a *de facto* joint venture in the arbitration proceeding cannot create a legal relationship that never existed. Rather, Relator must allege facts to show that a joint venture existed as that term is understood in the

-10-

context of government contracts. Opinion testimony does not suffice. Moreover, in the arbitration, Maus was not even offering his opinion based on the SBA's 8(a) regulations or the FAR. Rather, he offered his analysis based on his professional and personal experience, including his own participation in the joint venture ownership of thoroughbred horses. *Id.*

Simply because the terms "joint venture" and "*de facto* joint venture" are similar does not mean the terms are functional equivalents. For example, the SBA's Office of Hearing and Appeals (OHA)[13] has held that a party's use of the term "*de facto* joint venture" in another context does not necessarily mean that term would have the same meaning in an SBA size protest. *See Size Appeal of: Olgoonik Diversified Servs., LLC*, SBA No. SIZ-5825, 2017 (2017). In *Olgoonik*, a contractor submitted a proposal for a State Department Contract for construction work on the U.S. Embassy in Iraq. In its proposal, the contractor certified that it was a "*de facto* joint venture" as that term is used under the Diplomatic Security Act—meaning that its sister companies would guarantee its performance. When a competitor filed a size protest, Olgoonik argued that there was no requirement that the SBA approve of the *de facto* joint venture. The OHA agreed, finding that the term "*de facto* joint venture" as used under the Diplomatic Security Act, "had a different meaning than under SBA's regulations." *Id.* at 9.

Here too, Relator equates Maus' opinion of what constitutes a "*de facto* joint venture" with "joint venture" as that term is used in the government contracts context. But as in *Olgoonik*, "[t]he same words have different meanings in the context of their use." *Id.* Accordingly, Maus' characterization of the FPI-McConnell relationship as a *de facto* joint venture is of no moment

---

[13] The OHA is responsible for interpreting the SBA's regulations and provides independent, quasi-judicial review of decisions from the SBA's Area Offices and has developed a substantial body of case law on issues such as 8(a) eligibility and control. Decisions made by the OHA are final agency decisions entitled to deference when reviewed by a federal court. *See, e.g.*, *Metro Mach. Corp. v. U.S. Small Bus. Admin.*, 305 F. Supp. 2d 614 (E.D. Va. 2004) (finding that SBA's construction of its own regulation was entitled to substantial deference).

-11-

and the FAC's allegations fail to establish any falsity based on an underlying violation of SBA regulations.

### c. McConnell Did Not "Control" FPI

The FAC also alleges that McConnell exercised improper control over FPI in violation of § 124.106. FAC ¶ 38. The regulation at § 124.106 refers to both the "strategic policy setting" and the "day-to-day management and administration of business operations" of the 8(a) business which must be conducted by one or more disadvantaged individuals with "requisite management capabilities" and holding the highest officer position in the company. *Id.* Relator's conclusory assertion about control fails for two reasons. First, there are no facts alleged that McConnell could exercise control over the strategic policy setting or the day-to-day management of FPI. Second, the FAC conflates McConnell's involvement with two contracts with the ability to control an entire business.

The FAC contains no allegations that anyone other than Park, the President and General Manager of FPI, held the highest officer position in FPI, which is exactly what is required by § 124.106(a)(2). The FAC also fails to allege that anyone but Park controlled the board of FPI, as required by § 124.106(d)(1)(ii) . Relatedly, the FAC does not allege that anyone but Park was responsible for the setting of strategic policy at FPI. Nor does the FAC contain factual allegations to explain how McConnell—a resident of California (FAC ¶ 6)—somehow exercised control of the day-to-day management of a design-build contractor from more than 5,000 miles away. *See* ECF No. 1 at p. 50 (agreeing that in order to keep McConnell's "travel related expenses to a minimum … any visits by [McConnell] to Guam will be as jointly agreed by [Park] and [McConnell]").

Lacking any detailed facts about McConnell's involvement with FPI, Relator speculates that Defendants used the Consulting Agreement to "circumvent" the control requirements of

§ 124.106. FAC ¶ 28. In support of this theory, Relator cites language from the Consulting Agreement stating that McConnell will "manage" aspects of the roofing projects. FAC ¶ 81. But management alone is insufficient to establish control because the SBA regulations expressly state that non-disadvantaged individuals or immediate family members "may be involved in the management" of the 8(a) participant business so long as the non-disadvantaged individual or immediate family member does not exercise actual control or have the power to control. *See* 13 C.F.R. § 124.106(e)(1). Under Relator's misreading of the regulation, he himself would have violated the 8(a) requirements because he was proposed as a "project manager" for InfraTech at a time when his wife was the qualifying disadvantaged individual for her 8(a) company. *See* ECF No. 1 at p. 64. Surely, a violation of § 124.106 requires more than mere management responsibilities.

Relator attaches several documents to the FAC in an effort to establish that McConnell had the power to control FPI, but these documents serve only to undermine Relator's allegations. For example, the Consulting Agreement and its amendments do not include any facts to suggest that Park was ceding control of FPI to McConnell. On the contrary, the Consulting Agreement suggests that the parties entered into the arrangement so that McConnell could "assist" FPI in the "self performance" of the roofing work. FAC Ex. A, ECF No. 20-1. As described above, such self-performance is consistent with the 8(a) program's goal of developing businesses that will be self-sustaining after graduating from the 8(a) program.

Moreover, Relator's allegations as to the performance of the two IDIQ contracts cited in the FAC are insufficient to establish control of the company's roofing division, much less all of FPI. Notably, the SBA requirements at § 124.106 are focused on what constitutes control of a "participant" business. There is nothing in § 124.106 to suggest that the control analysis is meant to be performed on anything but a business-wide basis. No reading of § 124.106 provides for task

-13-

order or contract-specific analysis. Yet Relator asks the Court to make a finding of control in a vacuum, based solely on McConnell's involvement with the roofing contracts. The regulations simply do not support such an approach.

The FAC acknowledges that FPI is a "general contractor" (FAC ¶ 17) and the pleadings concede that FPI did not exist merely to perform the two roofing contracts. *See* ECF No. 1 at p. 49 (referencing design-build contract).[14] In addition, the FAC alleges no facts that would demonstrate that McConnell's assistance with the roofing contracts somehow allowed him to exercise control over the entire company. These admissions and omissions are fatal to the FAC's theory that a single individual's assistance with roofing-specific task orders gave him control over the entirety of a design-build firm.

At bottom, Relator's complaint relies on conclusory allegations of "control" insufficient to support termination from the 8(a) program. *See Desa Grp., Inc. v. U.S. Small Bus. Admin.*, 190 F. Supp. 3d 61, 69 (D.D.C. 2016) (finding that SBA acted arbitrarily by terminating participant from the 8(a) program based on conclusory statements that participant was dependent on a non-disadvantaged company such that it "cannot exercise independent business judgment without great economic risk") (citing 13 C.F.R. § 124.106(g)(4)). For instance, Relator makes the bald statement that the Consulting Agreement "gave McConnell control" of FPI in violation of § 124.106. FAC ¶¶ 37-38, 46. But the only "fact" offered in support of this conclusory allegation is that the Consulting Agreement provided that "Fargo will provide McConnell with copies of all invoices and checks issued by Fargo as part of the task order job costs 'so that they may be approved [by McConnell] and included in the Gross Profit spreadsheet.'" FAC ¶ 85(e). This

---

[14] Indeed, FPI was not a fly-by-night operation established solely for the purpose of receiving the roofing IDIQs. As the FAC concedes, FPI had been in existence for over thirty years at the time it received these contracts (FAC ¶ 17) and had developed its own workforce.

hardly establishes that McConnell "controlled" the company in any sense, much less under the applicable regulations.

In sum, Relator alleges only that McConnell assisted with the performance of roofing task orders, not the entirety of FPI's business. (FAC ¶ 85(c)). Accordingly, the FAC has failed to establish that a non-disadvantaged individual exercised control over FPI. With no leg to stand on as to the falsity element, the FAC should be dismissed.

### 2. The FAC Fails to Allege That Any Claims were "Knowingly" False

The FAC also fails to allege specific facts that would permit an inference that Defendants knowingly caused the submission of false claims. To satisfy the knowledge element of the False Claims Act, requires a "knowing" state of mind, which means having actual knowledge or information, or acting in either deliberate ignorance or reckless disregard of the information's truth or falsity. *See* 31 U.S.C. § 3729(b). Innocent mistakes, negligent misrepresentations, or differences in interpretations are not sufficient to establish liability. *See United States v. Corinthian Colls.*, 655 F.3d 984, 991, 996 (9th Cir. 2011).

Entirely absent from the FAC are factual allegations that would demonstrate that any of the Defendants knew that the Consulting Agreement violated FPI's 8(a) status and rendered FPI ineligible for the award of the roofing contracts, as the FAC surmises. Instead, the FAC relies on conclusory assertions that the Defendants "deliberately withheld" the Consulting Agreement from the government in the award and performance of the roofing contracts. *See, e.g.*, FAC ¶ 61. Such conclusory assertions, however, are insufficient to support an inference of knowing conduct actionable under the FCA. *See, e.g., United States ex rel. Raynor v. Nat'l Rural Utils. Coop. Fin., Corp.*, 690 F.3d 951, 957 (8th Cir. 2012) ("Raynor's complaint made no factual allegations of knowing fraud."); *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379

-15-

(4th Cir. 2008) (relators "fail[ed] to adequately plead scienter" where complaint did not "set forth specific facts that support an inference of fraud") (quotation omitted).

To be sure, Relator suggests that the Consulting Agreement was a "*secret* illegal agreement" (FAC ¶ 45) because of the fact that the agreement contained a confidentiality provision. FAC ¶ 36. But there is no basis for the Court to read an unlawful intent into a standard confidentiality provision. It is a well-established rule of contract construction that when interpreting agreements—such as the Consulting Agreement between FPI and McConnell— courts interpret the agreement as if it was intended to be lawful rather than unconscionable, fraudulent, or otherwise illegal. *See Restatement (Second) of Contracts* § 203, comment c (1981); *see also Saavedra v. Donovan*, 700 F.2d 496, 500 (9th Cir. 1983) (citing § 203 for proposition that courts should interpret agreements as lawful). Here, FPI had a valid business reason for including the confidentiality provision in the Consulting Agreement–*i.e.*, the Agreement and its amendments referenced proprietary information about FPI's direct costs and field bonuses. The confidentiality provision does nothing to demonstrate that Defendants knowingly concealed the agreement from the government in the context of the contracts, much less that they knew that the agreement was required to be disclosed.

The FAC also fails to sufficiently allege knowledge because the very question of whether the Consulting Agreement is the legal equivalent of a joint venture under SBA regulations is at best subject to differing interpretations. Instead of merely conclusory allegations, to satisfy the knowledge requirement in a False Claims Act case, a plaintiff must prove that the defendant made "a palpably false statement, known to be a lie <u>when it is made</u>." *Hendow*, 461 F.3d at 1172 (emphasis added).[15] But a statement cannot be objectively false if there is a reasonable

---

[15] Relator alleges that Park testified in 2016 that he "hid" the "profit-sharing agreement" from the Navy because he knew that if the Navy found out he would not get the get the 8(a) set-aside contracts. FAC ¶ 71(b). But as described (Continued…)

-16-

interpretation of the regulation under which the statement was not false or if the statement involves a disputed legal issue. *See Hagood v. Sonoma Cty. Water Agency*, 81 F.3d 1465, 1477-78 (9th Cir. 1996) ("Even viewing Hagood's evidence in the most favorable light, that evidence shows only a disputed legal issue. . . ."); *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999) ("differences in interpretation growing out of a disputed legal question are … not false"); *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287 (D.C. Cir. 2015) ("Consistent with the need for a knowing violation, the FCA does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation.").

A disputed legal issue cannot form the basis of a finding of "knowing" falsity, but that is precisely what the FAC attempts to do here even though Relator knows full well from the prior arbitration that the allegations in the FAC are based on disputed issues. The question of whether McConnell was an "equal partner and/or was in a *de facto* joint venture" with FPI (FAC ¶ 38) was a central issue in Phase II of the arbitration between the parties. Ultimately, this Court need not accept the arbitrator's finding that that the arrangement between FPI and McConnell was <u>not</u> a 50-50 equal partnership (FAC Ex. H, ECF No. 20-8, p. 4), but the fact that this very question was the subject of a dispute means that FPI's interpretation could not have been knowingly false.

### 3. The Complaint Fails to Allege Materiality

The FAC also fails to adequately plead facts supporting the allegation that compliance with a particular SBA requirement was material to the Navy's decision to pay FPI. For a False

---

above (*supra* IV. A. 1.), the Consulting Agreement was not a joint venture that necessitated disclosure, and Relator has not pointed to any other legal obligation to disclose the Consulting Agreement. In fact, it would have been impossible to hide the Agreement at the time of the 2006 contract award because the Agreement did not even exist. Moreover, an alleged comment that was purportedly made in September 2016 does not support the allegation that Park made a palpably false statement that was known to be a lie when it was made years earlier. *Hendow*, 461 F.3d at 1172; *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996) (noting that cases brought under a theory of fraudulent inducement are only actionable in "rare circumstances" because the "promise must be false when made").

Claims Act claim to withstand a motion to dismiss, the complaint must present concrete allegations from which the court may draw the reasonable inference that the alleged misrepresentations were material to the government's decision to pay a claim. *See Universal Health Servs., Inc. v. United States ex rel Escobar*, 136 S. Ct. 1989, 2003 (2016) ("The False Claims Act is not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations.") (internal citation omitted). The statute's materiality standard is both "demanding" and "rigorous" requiring courts to "look to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id*. at 2002-03 (internal quotation marks and citation omitted).

The thrust of Relator's claim is that the Defendants violated the False Claims Act when they falsely certified or verified on several occasions that FPI met the relevant SBA regulatory requirements to qualify as an 8(a). But these allegations only address FPI's eligibility to participate in the 8(a) program, making no mention of, or connection to the Navy's decision <u>to pay</u> FPI for work performed under the contracts at issue.

Here, the FAC's allegations that Defendant's purported SBA violations were material to the government's decision to pay are wholly conclusory. *See* FAC ¶ 88 ("The false or fraudulent statements by Fargo and McConnell were material to the Navy's decision to award the 2006 IDIQ Contract to Fargo."); FAC ¶ 139 ("the false certifications made by Fargo were material to the United States' decision to pay Fargo for the work performed"). Such conclusory allegations are insufficient because materiality must be pled with plausibility and particularity. *Escobar*, 136 S. Ct. at 2004 n.6. Without more, these provisions provide little support for the notion that FPI's 8(a) status was material to the Navy's decision to pay FPI. *See United States v. Strock*, No. 15-CV-0887-FPG, 2018 WL 647471, at *9 (W.D.N.Y. Jan. 31, 2018) (finding that allegations in the complaint failed to connect alleged falsities about set-aside eligibility to government's decision to

-18-

pay for work under those contracts), *reconsideration denied*, No. 15-CV-887-FPG, 2018 WL 4658720 (W.D.N.Y. Sept. 28, 2018).

At most, the FAC alleges that the SBA would have had the <u>option</u> to terminate FPI from the 8(a) program had it known of the existence of the Consulting Agreement, but this is not sufficient to establish materiality. *Escobar*, 136 S. Ct. at 2003 (noting that it is not "sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance"). To make a showing of materiality, Relator would have to, at minimum, plead examples of the government refusing to pay contractors in similar circumstances or allege facts showing that the government likely would not have paid FPI had it known of the existence of the Consulting Agreement. But Relator has not (and cannot) allege such facts because action by the SBA under these circumstances is highly discretionary. *See, e.g.*, *A1 Procurement, LLC v. Thermcor, Inc.*, No. 2:15cv15, 2017 WL 2881350, at *7 (E.D. Va. July 5, 2017). As explained in *A1 Procurement*, the regulations provide the SBA with broad discretion so that "businesses owned by disadvantaged individuals who fail to dot every 'i' and cross every 't' will not automatically be removed from the program." *Id.* There, the court reasoned that it would "frustrate the policy objectives of the 8(a) program" to convert the SBA's discretion into a "rigid test that deems an 8(a) participant's conduct to be in violation of the FCA, whenever the company ***fails to comply with a competing business's interpretation of the regulatory scheme*** and subsequently makes a claim for payment." *Id.* (emphasis added). The same reasoning is equally applicable here—and the Court need not accept Relator's interpretation of what constitutes control under § 124.106.

Because Relator has not sufficiently alleged that the use of the Consulting Agreement was material to the government's payment decision, the FAC cannot withstand a motion to dismiss.

-19-

### 4. The FAC Lacks Reliable Indicia that Lead to a Strong Inference that False Claims were Actually Submitted for Payment

Moreover, the FAC must be dismissed because it lacks reliable indicia to support Relator's allegation that a false claim was actually submitted to the government. The failure to properly plead the presentment of a claim for payment is cause for dismissal because the submission of an actual claim is the "*sine qua non*" of a False Claims Act violation. *See, e.g.*, *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 997, 1002 (9th Cir. 2002) ("It is not enough for Aflatooni to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted.") (internal quotation marks and citation omitted); *Hopper*, 91 F.3d at 1266 ("[T]he [False Claims] Act attaches liability, not to underlying fraudulent activity, but to the 'claim for payment.'").

To survive a motion to dismiss, a relator must either (i) identify specific claims that were actually submitted or (ii) include "particular details of a scheme to submit false claims paired with reliable indicia" that lead to a strong inference that claims for payment were actually submitted. *Ebeid*, 616 F.3d at 998-99. Here, Relator has done neither. Relator not only fails to allege any facts about specific claims that were actually submitted, but the FAC is also devoid of reliable indicia that would create an inference that a false claim was presented to the government. *Aflatooni* instructs that it is insufficient for a Relator to describe an alleged scheme and assume that claims for payment must have been submitted, and yet here, the FAC fails to specify the content of any claim for payment, the date of a claim for payment, or point to a specific false statement or certification within any claim, nor explain why such a statement was false or fraudulent. Relator pleads only conclusory assertions based on his own speculation that claims were submitted. In sum, Relator's failure to create a strong inference that false claims were submitted is fatal to his claim for relief.

## B. Count I and Allegations About Conduct Prior to November 28, 2007 Lack Plausibility

In addition to the reasons set forth above, Relator has failed to state a viable claim for relief with respect to the alleged misconduct occurring prior to November 28, 2007, when the Consulting Agreement was signed. The FAC's (conclusory) allegations regarding falsity, knowledge, and materiality all arise from the Consulting Agreement. FAC ¶ 74 ("FPI, Park and McConnell perpetrated a fraud on the United Stated [*sic*] beginning on November 16, 2007, when they signed the 2007 Consulting Agreement[.]"). Relator fails to plead any facts that would support the allegation that the 2007 Consulting Agreement somehow had an effect on the award of the 2006 IDIQ contract a year earlier. FAC ¶ 83.

Moreover, Count I of the FAC alleges that "[t]he false or fraudulent statements by FPI and McConnell were material to the Navy's decision to award the 2006 IDIQ Contract to FPI." FAC ¶ 88. But if the Consulting Agreement is what makes FPI's claims for payment false, the execution of the Consulting Agreement in November of 2007 simply could not have influenced the government's decision to award the contract in 2006. The FAC's allegation otherwise is simply nonsensical and does not set forth a plausible claim.

## C. Relator Fails to Plead with Particularity the Who, What, When, Where, and How of the Alleged Fraud as Required Under Rule 9(b)

Even if Relator's complaint set forth the elements of a claim for relief—and it does not come close—it would still need to be dismissed because the FAC lacks the sort of detailed facts needed to satisfy the heightened pleading standards of Rule 9(b), which requires that circumstances constituting fraud be stated with particularity. *Bly-Magee*, 236 F.3d at 1018 ("[C]omplaints brought under the [False Claims Act] must fulfill the requirements of Rule 9(b)[.]").

-21-

Accordingly, Rule 9(b) requires a party to state with particularity the circumstances constituting fraud or mistake. *Ebeid*, 616 F.3d at 998. *Compare State of California ex rel. Mueller v. Walgreen Corp.*, 175 F.R.D. 631, 635 (N.D. Cal. 1997) (dismissing complaint which set forth the "nature" of the fraudulent scheme but not the time, place and content of the particular false claims), *with United States ex rel. McCoy v. California Medical Review, Inc.*, 723 F. Supp. 1363, 1372 (N.D. Cal. 1989) (complaint withstood Rule 9(b) because it identified the specific documents alleged to contain false certification information, the dates they were submitted to the government, and each defendant's part in the fraud). Here, Relator has failed to allege the "who, what, when, where, and how" of the submission of the purported false claims or false statements. The FAC's failure to meet this standard necessitates dismissal under Rule 9(b). *See Mueller*, 175 F.R.D. at 635.

For example, the FAC makes repeated reference to "false or fraudulent statements." FAC ¶¶ 88, 137. But the FAC fails to describe the content of even one such purportedly false statement made to the government, whether in FPI's proposals for the roofing task orders or its claims for payment submitted to NAVFAC. It is well-established that allegations of false statements must be pled with particularity. *See, e.g.*, *Ebeid*, 616 F.3d at 998 (the complaint must set forth with particularity "what is false or misleading about a statement, and why it is false"); *United States ex rel. Mateski v. Raytheon Co.*, No. 2:06-cv-03614-ODW(KSx), 2017 WL 1954942, at \*5, n.3 (C.D. Cal. Feb. 10, 2017) ("[I]t would be completely inconsistent with Rule 9(b)'s particularity requirement not to require the relator to identify that specific representation in the complaint."). The FAC falls far short of this standard.

**D.** **Any Claims for Payment Submitted Prior to August 24, 2007 are Time-Barred**

For the reasons set forth above, the FAC should be dismissed in its entirety, but at the very least, all claims submitted prior to August 24, 2007, must be dismissed as time-barred. An action

-22-

under the False Claims Act must be brought within six years of when the violation occurred, 31

U.S.C. § 3731(b)(1), or within three years after the "the official of the United States charged with

responsibility to act in the circumstances" knew or should have known the relevant facts. 31

U.S.C. § 3731(b)(2). However, "in no event" may an action be brought more than 10 years after

the alleged violation. *Id*; *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct.

1507, 1510 (2019).

Here, Relator's lawsuit was originally filed on August 24, 2017, which had the effect of

tolling the statute of limitations as of that date. But any claims for payment that occurred outside

the ten-year look back (*i.e.*, before August 24, 2007) are untimely. Accordingly, any claims for

payment submitted before August 24, 2007 are time-barred and must be dismissed.

## V.      CONCLUSION

For the foregoing reasons, Defendants respectfully requests that the FAC be dismissed it

its entirety under Rule 12(b)(6) for failure to meet the pleading standards of Rules 8(a)(2)  and

9(b).

BLAIR STERLING JOHNSON & MARTINEZ
A PROFESSIONAL CORPORATION


Dated: July 23, 2019          By:_____/s/_____
                                     Thomas C. Sterling, Esq.

CROWELL & MORING LLP


Dated: July 23, 2019          By:_____/s/_____
                                     Brian Tully McLaughlin (pro hac vice)
                                     Jason M. Crawford (pro hac vice)
                                     Sarah A. Hill (pro hac vice)

Attorneys for Defendants
FARGO PACIFIC INC., EDGAR L.
MCCONNELL, and JAY S.H. PARK

-23-