BRIAN TULLY MCLAUGHLIN
ALEXANDRA NKECHI KANU
AMANDA H. MCDOWELL
**CROWELL & MORING LLP**
1001 PENNSYLVANIA AVE., N.W.
WASHINGTON, D.C. 20004
TEL: (202) 624-2500
FAX: (202) 628-5116

THOMAS C. STERLING
R. MARSIL JOHNSON
**BLAIR STERLING JOHNSON & MARTINEZ**
A PROFESSIONAL CORPORATION
1411 PALE SAN VITORES ROAD, SUITE 303
TAMUNING, GUAM 96913
TEL: (671) 477-7857
FAX: (671) 472-4290

*Attorneys for Defendants*
*Fargo Pacific, Inc. and Jay S.H. Park*

**IN THE DISTRICT COURT OF GUAM**

**TERRITORY OF GUAM**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* RAVINDRA GOGINENI,<br><br>Plaintiff/Relator,<br><br>v.<br><br>FARGO PACIFIC INC., EDGAR L. MCCONNELL, and JAY S.H. PARK,<br><br>Defendants. | Case No. 17-0096<br><br>**DEFENDANTS FARGO PACIFIC, INC., AND JAY S.H. PARK'S EMERGENCY MOTION TO ALTER ORDER ON SUMMARY JUDGMENT (ECF 163, ECF 146)** |

Defendants Fargo Pacific, Inc., and its owner, Jay S.H. Park (collectively, "Defendants") respectfully ask the Court to reconsider and alter its Opinion and Order (ECF 163) adopting the Magistrate Judge's Report and Recommendation on Defendants' summary judgment motions (the "R&R") (ECF 146). Defendants previously objected to the R&R's failure to address the key regulation underlying the core allegation in the case – whether Mr. Park ceded "ownership" or "control" of Fargo to Mr. McConnell, as set forth in 13 C.F.R. § 124.106, by virtue of McConnell's consulting arrangement to provide management assistance on certain roofing contracts. The R&R ignored control and § 124.106 altogether, basing its recommendation instead on whether the consulting agreement created a "de facto" joint venture relationship between McConnell and Fargo as the basis for denying Defendants' motions. The Court has since ruled that Relator is precluded from re-litigating whether the consulting agreement is a joint venture. *See* ECF 222; ECF 253 (holding that Relator is barred from re-litigating whether the consulting agreement was a "de facto" joint venture, but not necessarily precluded from arguing that consulting agreement improperly gave McConnell control.). As a result, the underpinnings of the R&R and the order adopting it no longer subsist, and the R&R's failure to address the central issue of control warrants reconsideration.

Accordingly, Defendants request that the Court reconsider their motion for summary judgment to address whether Defendants knowingly submitted false certifications of compliance with 13 CFR § 124.106 in Fargo's claims for payment to the Navy.[1]

## ARGUMENT
### I. LEGAL STANDARD

An order denying a motion for summary judgment is generally interlocutory and "subject to reconsideration by the court at any time." *Dessar v. Bank of America National Trust and Savings Assoc.*, 353 F.2d 468, 470 (9th Cir. 1965); *Hoffman v. Tonnemacher*, 593 F.3d 908, 911 (9th Cir. 2010) (citing *Dessar* and noting "possibility of summary judgment remains on the table even after a district court has denied a summary judgment motion"). "As long as a district court

---

[1] Defendants incorporate and maintain all objections to the R&R, but limit this motion to those primarily implicated by the Court's joint venture preclusion ruling.

has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001). *See also Yates v. United States Env't Prot. Agency*, No. 6:17-CV-01819-AA, 2020 WL 2311550, at *1 (D. Or. May 8, 2020); Fed. R. Civ. P. 54(b).[2]

A district court may properly reconsider its decision if it (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law. *Smith v. Clark Cnty. Sch. Dist.*, 727 F.3d 950, 955 (9th Cir. 2013). Clear error occurs when "the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." *Id*. (affirming district court's reconsideration of denial of summary judgment motion based on clear error because court had failed to consider party's argument).[3]

## II. THE R&R'S DENIAL OF DEFENDANTS' MOTION BASED ON THE JOINT VENTURE ALLEGATION CANNOT STAND

Relator's core allegation in the Second Amended Complaint ("SAC") is that, while participating in the 8(a) Program, "Fargo, acting through Park, entered into secret illegal agreements [the Consulting Agreement and its amendments] with McConnell, a person who is not a socially and economically disadvantaged individual or member of a minority group, to circumvent the control requirements under Title 13 CFR § 124.106." ECF 50, SAC ¶ 32; *id*. ¶ 66 (alleging that the "*de facto* joint venture" was "in violation of 13 CFR § 124.106); *see id*. ¶¶ 67, 81, 90, 99, 106, 113, 143, 156, 179, 189 (alleging the Consulting Agreement gave McConnell control). This regulatory compliance issue is the predicate to whether Defendants violated the

---

[2] A denial of summary judgment is generally considered interlocutory in character and is not a final judgment. *Brodheim v. Cry*, 584 F.3d 1262, 1274 (9th Cir. 2009); *United States v. Martin*, 226 F.3d 1042, 1048 (9th Cir. 2000).

[3] Because the issues were fully developed and briefed at summary judgment, the impending trial date is no bar to reconsideration. Indeed, district courts "unquestionably possess the power to enter summary judgment sua sponte, even on the eve of trial." *Norse v. City of Santa Cruz*, 629 F.3d 966, 971 (9th Cir. 2010) (noting sua sponte grants are appropriate if the losing party has notice that the sufficiency of their claim will be in issue). No further briefing is necessary to reconsider Defendants' motion.

False Claims Act in their roofing contracts by (allegedly) falsely certifying to the Navy, in contract proposals and claims for payment, that Fargo was compliant with the control and ownership requirements. That is because the False Claims Act ("FCA") "is not . . . a vehicle for punishing . . . regulatory violations." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016). Rather, "the [FCA] attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'" *Cafasso v. Gen. Dynamics C4 Sys. Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (citation omitted); *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 333 (9th Cir. 2017) ("'[A]n actual false claim is the *sine qua non* of an FCA violation.'") (citation omitted). *See also United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996) ("Mere regulatory violations do not give rise to a viable FCA action."); *id.* ("A violation of a regulatory provision, in the absence of a knowingly false or misleading representation, does not amount to fraud.") (internal quotation marks and citation omitted).

In their summary judgment motion, Defendants argued that the record was devoid of evidence to support a finding for the predicate to a potential false claim because Mr. Park did not cede control of his firm to Mr. McConnell. Defendants pointed out that under the plain language of the regulation on control, there was no genuine issue of material fact as to whether Mr. Park ceded control of Fargo to Mr. McConnell. ECF 95 at 7-17; ECF 124 at 5-13. First, Mr. Park owned Fargo at all times, and McConnell never had an ownership interest in the firm. ECF 100 ¶¶ 3-5. Second, Defendants analyzed each factor set forth in 13 CFR § 124.106 and demonstrated the lack of a genuine dispute as to McConnell having control over Fargo. *See* ECF 95 at 10-12 (including table of factors under 13 CFR § 124.106 and citing to undisputed material facts in ECF 100 (SOF)). Defendants submitted a mountain of evidence to demonstrate that Park held and maintained control over Fargo. *See generally* SOF and exhibits thereto. For example:

- Park was Fargo's President and General Manager with managerial authority over all aspects of the business, and worked full-time. ECF 100, SOF ¶ 5.
- Park served as Fargo's Responsible Managing Employee, directly supervising all contracting activities, including performance, payment, compliance, business development, accounting and administration. *Id.* ¶ 5.

- Park was the ultimate decider on what solicitations to bid on and finalization of all proposals; he also oversaw all personnel decisions. *Id*. ¶ 5.
- Fargo obtained a specialty roofing license prior to 2007 and manufacturer applicator certifications for roofing systems in 2007 and 2008 in order to provide manufacturer warranties required under the roofing contracts. *Id*. ¶¶ 10, 35; *see* Ex. 49 (Fargo's applicator certifications and warranties compilation); Ex. 50.
- Park hired specialized roofing personnel into Fargo starting in 2007 so as to begin self-performing roofing requirements. *Id*. ¶ 21; R&R at 5.
- Fargo provided all labor, all performance and payment bonding, all certificates of insurance, manufacturer certifications for warranties, and all "key personnel" roles for the 2009 IDIQ and sole source contracts. *Id*. ¶¶ 30, 31, 35, 37.
- All Fargo invoices to the Navy required Park's review and approval. *Id*. ¶ 36.
- Park was the authority for approval and payment of all expenditures, and was the only one authorized to issue company checks. *Id*. ¶¶ 5, 40.

In contrast, Defendants demonstrated that McConnell had no role in Fargo company-wide matters, strategic planning, bonding, insurance, the applicator certifications/warranties, or submitting invoices to the Navy. *Id*. ¶ 43. He had no authority to submit bids on Fargo's behalf or bind the company, nor over Fargo employees, and no access to Fargo's accounts. *Id*. ¶ 42. McConnell was never an officer or director of Fargo, and had no ownership, stock or voting rights. *Id*. ¶¶ 44, 45. His role was limited to supporting the roofing contracts, which represented about one-third of Fargo's revenues during the relevant time period. *Id*. ¶ 6. And he was infrequently involved in the day-to-day performance of those contracts, spending only several weeks a year on Guam, away from his home in California. *Id*. ¶¶ 13, 16, 38. He kept his own accounting spreadsheets for the roofing task orders to track any profit, using data / receipts shared by Fargo, but had no access to Fargo's accounting software or books. *Id*. ¶¶ 46-48. All payments to McConnell had to be approved by Park, and no compensation was owed until Fargo had been paid by the Navy and only if a profit was earned, putting McConnell (not Fargo) at risk. *Id*. ¶ 50.

Defendants also demonstrated the lack of support for Relator's contention that loss of control under 13 CFR § 124.106 could stem from McConnell's consulting agreement to assist with Fargo's roofing contracts. Defendants noted first that the control regulation, by its plain language, addresses control of the firm as a whole – not of individual contracts. ECF 95 at 9, 11;

ECF 124 at 6-7. The roofing contracts to which the consulting agreement applied represented only a portion of its 8(a) contracts and overall portfolio, as noted above. *See* ECF 100, SOF ¶ 6. Even assuming *arguendo* that control of a contract could prove loss of control over a company, Defendants showed, *inter alia*, that under the consulting agreement and the record evidence, McConnell did not have ultimate authority or control over Fargo's 8(a) roofing contracts, which was confirmed not only by undisputed testimony from McConnell and Fargo personnel, but by the Navy itself, whose personnel testified that McConnell did not have authority to negotiate on Fargo's behalf without Mr. Park's permission. ECF 95 at 12-14 (citing ECF 100, SOF); ECF 124 at 7-11. In sum, Defendants demonstrated that there was no triable issue as to whether Mr. Park maintained control over his company, Fargo, in spite of Relator's allegations as to the nature of the consulting agreement.

The R&R's key failure was that it altogether failed to analyze or address control in recommending denial of summary judgment on Counts II-IV. This was clear error.[4] The R&R did so notwithstanding that the parties focused heavily on this issue in their briefing, as did the Magistrate Judge at oral argument on Defendants' motions. *See* ECF 151-1 at 39-43 (discussing control and dispute as to regulation's application to firm or contracts). But the R&R did not even mention much less discuss the control regulation or its factors at § 124.106, the relevant law, or any of the evidence on this pivotal issue. Had he done so, the Magistrate Judge would have had to address the undisputed evidence presented by Defendants that demonstrates no reasonable jury could find that Park gave up ownership or control of his company.

Instead, the R&R relied on the Relator's claim that the consulting agreement was a *de facto* joint venture to deny summary judgment as to the element of falsity. *See* ECF 146 at 19 (finding implied certification theory of falsity plausible for Counts II and IV based on joint venture allegation); *id*. at 22 (recommending denial of summary judgment on Count III due to

---

[4] Where a magistrate's report and recommendation on a dispositive motion fails to address a party's argument, the Ninth Circuit disfavors a boilerplate order adopting it. *See United States v. Jones*, 837 F. App'x 423, 424 (9th Cir. 2021) (the district court "should not have summarily adopted the magistrate judge's report and recommendation without addressing all of Defendant's objections, namely that the magistrate judge failed to address [certain challenges]") (emphasis added) (citing *Brown v. Roe*, 279 F.3d 742, 745 (9th Cir. 2002).

formation of joint venture theory). Defendants noted their multiple objections to the R&R, in particular the R&R's failure to address the alleged control violation that is the core of Relator's case and the predicate for a false claim or certification. ECF 151 at 6-16.

While each of Defendants' objections to the R&R warrant revisiting the Court's order on summary judgment, at a minimum the R&R's error in focusing only on Relator's joint venture theory while declining to address control can no longer stand. The Court recently granted Defendants' motion to preclude Relator from re-litigating whether the Consulting Agreement was a "de facto" joint venture. *See* ECF 222 (Jan. 19, 2024 Minute Order); ECF 253 (Feb. 14, 2024 Opinion Regarding Defendants' Motion in Limine No. 1). As a result, the basis upon which the R&R recommended denying summary judgment on Counts II, III, and IV, is no more. As noted by the Court in its Opinion (ECF 253), the case is proceeding on whether Fargo violated the False Claims Act by submitting claims for payment to the Navy that falsely certified its compliance with 13 CFR § 124.106's control factors. Defendants properly sought a summary judgment ruling as to whether the evidence could support a reasonable jury finding for Relator. It did not receive that ruling from the R&R and requests it now.

### III. THE MAGISTRATE'S FAILURE TO ADDRESS CONTROL UNDERCUTS ALL PORTIONS OF THE R&R

#### A. The Court Should Determine Whether Fargo's Claims for Payment Certified to Control

The R&R relied on the nondisclosure of the alleged "de facto" joint venture as the basis for finding plausible Relator's claims of fraudulent inducement (Count III) and implied certification (Counts II and IV). Each was in error and should be reconsidered.

##### 1. The R&R's Fraudulent Inducement Analysis Must Be Reconsidered

The R&R misapplied the law in summarily concluding that Relator's fraudulent inducement claim could survive. The Magistrate Judge cursorily wrote that a trier of fact could determine (1) that Defendants' relationship was in the form of a joint venture and (2) that Fargo was therefore ineligible for the award of that contract. ECF 146 at 22. This recommendation is undercut in light of the removal of the joint venture theory from the case.

The R&R erred by ignoring the undisputed facts as to the award of the 2009 IDIQ.

Relator *concedes* that "Fargo was eligible to submit and compete for 8(a) set aside contracts because it was an SBA 8(a) certified company[.]" SAC ¶ 39. The undisputed fact is that Fargo was an 8(a) certified small business when it bid on the 2009 IDIQ. Accordingly, any representation in its bid that it was an 8(a) "eligible" company was a true statement. That undisputed fact means that a fraud in the inducement claim cannot survive as a matter of law. *See A1 Procurement, LLC v. Thermcor, Inc.*, No. 15cv15, 2017 WL 2881350, at *4-5 (E.D. Va. July 5, 2017) (granting summary judgment on fraudulent inducement claim and finding that 8(a) representation refers to 8(a) certification, not a self-determination of 8(a) compliance); *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996) (promise must be false when made).

Under the 2009 IDIQ solicitation, offers were only to be solicited from small businesses "expressly certified by the [SBA] for participation in the SBA's 8(a) Program" and that at the time of submission was "in conformance with the 8(a) support limitation" and "Business Activity Targets set forth in its approved business plan." ECF 100-32, Ex. 23 (at 22 of 35) (citing DFARS 252.219-7010(a), (b)). There is no dispute as to any of those factors in this case.

The R&R did not analyze Fargo's proposal for the 2009 IDIQ or the 2009 IDIQ RFP itself to determine what if any certifications or representations were made by Fargo in its proposal. This, too, was error.[5]

### 2. The R&R's Implied False Certification Reasoning Also Requires Reconsideration

The R&R demonstrably erred in holding that Fargo's invoices contained implied false certifications of 8(a) eligibility or compliance. ECF 146 at 17-18; *see* ECF 95 at 4-5; ECF 124 at 4; ECF 151 at 3-4 (Defs.' briefing). The R&R acknowledged the Supreme Court's admonition that implied certification is only viable where the invoices on their face do "not merely request

---

[5] No representations were made by Fargo in its contract proposal concerning control. To the extent that Fargo's representations/certifications through the online ORCA submission are found material to and the cause of the Navy's award of the 2009 IDIQ (Count III), Defendants note that this relates back to the issue of control over the company, as maintaining control is one of the representations required in that submission. *See* Relator's Trial Ex. 40 at 11. Relator did not argue this point at summary judgment, however, thereby waiving it.

payment, but also makes specific representations about the goods or services provided," and that those specific representations are then rendered misleading based on noncompliance with material requirements. *Escobar*, 579 U.S. at 190. But the Magistrate then departed from *Escobar* and held that Fargo's mere submission of its invoices was somehow a representation of 8(a) program eligibility or compliance. ECF 146 at 18 ("[b]y submitting the invoices in Fargo's name, Fargo was representing that the work was performed by an *eligible* 8(a) entity") (emphasis added). That reasoning is at odds with *Escobar* and its progeny and is demonstrably wrong.

First, the R&R's "eligibility" determination was based on reasoning that a "de facto" joint venture was "performing" rather than Fargo and, therefore, the performing entity was not eligible. As this relied on the Relator's excluded joint venture theory, it merits reconsideration.

Second, even assuming that the submission of an invoice could possibly be a "specific representation" of 8(a) *eligibility*—which it is not—it is undisputed that Fargo was, in fact, an 8(a) certified, eligible contractor. Again, even Relator concedes this. *See* ECF 50, SAC ¶ 22; *see also* ECF 100, SOF ¶ 3. And Relator's argument that eligibility was at issue because the "de facto" joint venture was somehow performing rather than Fargo is now moot. The allegations in this case relate to *compliance* with certain 8(a) regulations, not eligibility. This was plain error.

Third, even if the R&R's language was meant to encompass Fargo's *compliance* with the 8(a) control regulation, 13 CFR 124.106, a contractor's mere submission of an invoice in its own name does not under *Escobar* constitute a "specific representation" of *compliance* with unspecified regulations. *Escobar* requires much more – it expressly held that the claim for payment must on its face make "specific representations about the goods or services." *Escobar*, 579 U.S. at 190. Here, the claims for payment do not even reference 8(a) regulations or anything near them. In fact, the R&R on the prior page of its decision found that the claims for payment did *not* certify compliance with 8(a) regulations or even relate to them. ECF 146 at 17. Moreover, the R&R's reasoning conflicts with the undisputed fact that Fargo was the contractor awarded the Navy contracts. It could not have submitted its claims in any name other than its own. The R&R pointed to no legal or factual authority to support its finding that a contractor's submission of an invoice in its name equates to a *specific representation* about 8(a) compliance or

-8-

Case 1:17-cv-00096 Document 259 Filed 02/15/24 Page 9 of 13

eligibility, much less regulatory compliance that is not a term in the contract itself.

Fourth, controlling precedent demonstrates the error in the R&R. In *United States ex rel. Rose v. Stephens Institute*, 909 F.3d 1012 (9th Cir. 2018), the Ninth Circuit applied *Escobar* to an implied certification theory, finding that *Escobar's* requirements were met because the claim for payment on its face "*specifically represented* that the student applying for federal financial aid is an 'eligible borrower' and is 'accepted for enrollment in an eligible program.'" *Id*. at 1018 (emphasis added). These specific representations about compliance with Title IV's incentive compensation ban could be considered misleading half-truths based on the defendant's undisclosed noncompliance with that ban. *Id*. In contrast, the Ninth Circuit affirmed summary judgment in *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 332-33 (9th Cir. 2017), because the invoices there made *no* specific representations concerning the alleged fraud.[6] This case is like *Kelly*, not *Rose*. And these decisions make clear the error in the R&R's conclusion that merely submitting an invoice qualifies as a specific representation sufficient for an implied certification of 8(a) compliance. The Court should correct the R&R's holding otherwise.

**B.     The Court Should Reconsider Materiality Based on Control**

The R&R's recommendation to deny summary judgment as to materiality was similarly flawed in focusing on the joint venture theory without addressing control, and should be reconsidered anew. In addition, the R&R's failure to address key arguments made by Defendants also warrants reconsideration.

While the R&R properly recognized that the first *Escobar* factor in the holistic materiality analysis weighed *against* a finding of materiality because 8(a) compliance was not a condition of payment, ECF 146 at 27, it erred in its analysis of the other factors, both by failing to address control and otherwise conflating the law. Defendants incorporate their objections here (ECF 151 at 16-23) and briefly summarize those errors.

---

[6] *See also McElligott v. McKesson Corp.*, No. 21-15477, 2022 WL 728903, at *1 (9th Cir. Mar. 10, 2022) (invoice representations of delivering supplies did not qualify as a "specific representation" concerning alleged noncompliance with regulations governing supply chain); *Hopper*, 91 F.3d at 1266-67 (affirming summary judgment because claims for payment did not certify compliance with regulation allegedly violated).

-9-

First, the R&R failed to address the *Escobar* factor that it is not sufficient for a finding of materiality "that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Escobar*, 579 U.S. at 194. As discussed in Defendant's briefing, ECF 95 at 20-22, ECF 124 at 15-16, ECF 151 at 17-19, SBA has a regulation setting forth the very limited bases upon which SBA can request termination of an 8(a) contract, which would effect a stoppage of payment. These are relinquishment of ownership or control of the *entire firm*, or the legal transfer or novation of the entire 8(a) contract to another firm. 13 C.F.R. §§ 124.515(a)(1)(i)-(ii).[7] Pursuant to this provision, the government had a very limited basis upon which to seek termination of Fargo's contract – if its owner, Mr. Park, was not in control of the company as a whole. And this provision is discretionary, not mandatory – SBA would have the option to seek termination for a loss of control, but it would not be mandatory.[8] Thus, this *Escobar* factor undercuts materiality. But the R&R ignored it.

Second, with respect to the government response factor, the R&R also erred (ECF 146 at 29) when it found that Relator presented evidence to demonstrate that "the defendant *knows* that the government *consistently* refuses to pay claims *in the mine run of cases* based on noncompliance with the particular [ ] regulatory [ ] requirement." *Escobar*, 579 U.S. at 195 (emphasis added). As noted above, SBA's regulations speak to the contrary, as they make clear that contract termination is an option, not a rule. And Relator himself conceded in his opposition (ECF 111 at 27) that there was no "mine run of cases" to point to. It is not possible for the Defendants to have known that the government consistently refuses to pay when there was no mine run of cases in the first place, much less evidence that Defendants had knowledge of them.

---

[7] The IDIQ contracts included a corresponding clause. *See* ECF 100, Ex. 23 at 23-24 (DFARS 252.219-7009(c)(1)); *see also* SAC ¶ 67 (citing same clause).

[8] Pursuant to another regulation, SBA can seek to terminate a participant from the 8(a) *program* altogether for a variety of reasons. But even if SBA seeks program termination, *contract* termination is expressly carved out; SBA has *no option* to terminate contracts on the basis of a violation that could cause program termination. *See* 13 C.F.R. § 124.304(f)(1) ("After the effective date of . . . [program] termination, a Participant . . . is obligated to complete previously awarded 8(a) contracts, including any priced options which may be exercised."). This is a key distinction between administration of the 8(a) program (SBA domain) and contract payment (Navy domain).

Even more significantly, the R&R also erred with respect to this factor because it conflated the knowledge of an individual government employee with that of the agency in rejecting Defendants' undisputed point that, in the years since Relator filed suit in 2017, not only has the government not intervened in the case, the Navy and the SBA have declined themselves to take any remedial or administrative action against Fargo, and instead the Navy has continued to award Fargo new work. ECF 151 at 19-21; ECF 95 at 22-23; ECF 124 at 16. The Navy and the SBA learned of and investigated Relator's claims as far back as 2017, and have opted not to act. The R&R erred in dismissing this argument and evidence pointing against materiality.

These errors merit reconsideration of the R&R's materiality analysis.

**C. The Court Should Similarly Reconsider Defendants' Knowledge of Noncompliance with the Control Regulation**

Last, the Court should reconsider the R&R's analysis of scienter. Once again, the R&R erred here in failing to address "control" and the lack of evidence that Defendants knew that the consulting agreement with Mr. McConnell was (allegedly) contrary to some subpart of 13 CFR § 124.106. *See* ECF 151 at 23-25. The R&R did not discuss the Defendants' knowledge of the control regulation itself much less the evidence as to whether Defendants believed the consulting agreement operated to give McConnell control over Fargo as a company. Nor did it assess the evidence demonstrating that Defendants believed in good faith that the agreement did *not* implicate any of the control factors at all.

As the undisputed evidence shows, the Consulting Agreement was limited to Fargo's roofing work, a subset of Fargo's extensive portfolio of contracts, and only those projects expressly agreed to by Fargo/Park and McConnell. Park engaged McConnell as a roofing expert for roofing contracts, not to manage the company or all Fargo's other work, and not to take over control of Fargo. McConnell received no company-wide role or authority, no officer position, no stocks or shares, no voting power, and provided no critical financial support or license. ECF 100, SOF ¶¶ 42-43, 45. The limited scope of the Consulting Agreement and the parties' course of performance supports Defendants' belief that no loss of control was implicated. The R&R simply ignored this.

On reconsideration, the Court should assess the evidence on knowledge based on the Supreme Court's recent interpretation of the FCA's scienter provision, including as to reckless disregard, which the Court held requires proof that defendants are "conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway." *United States ex rel. Schutte v. Supervalu Inc.*, 143 S. Ct. 1391, 1401 (2023).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court reconsider its order adopting the R&R on summary judgment and grant Defendant's motion as to Counts II, III and IV.

Dated: February 15, 2024        Respectfully submitted,

/s/ *Brian Tully McLaughlin*
Brian Tully McLaughlin (*pro hac vice*)
Alexandra Nkechi Kanu (*pro hac vice*)
Amanda H. McDowell (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
Email: bmclaughlin@crowell.com

/s/ *R. Marsil Johnson*
Thomas C. Sterling, Esq.
R. Marsil Johnson, Esq.
BLAIR STERLING JOHNSON & MARTINEZ
A Professional Corporation
1411 Pale San Vitores Road, Suite 303
Tamuning, Guam 96913
Telephone: (671) 477-7857
Facsimile: (671) 472-4290
Email: tcsterling@bsjmlaw.com

*Attorneys for Defendants*
FARGO PACIFIC, INC. and JAY S.H. PARK